[No. S111028. July 29, 2004.]

THE PEOPLE, Plaintiff and Respondent, v.
JALEH WILKINSON, Defendant and Appellant.
In re JALEH WILKINSON on Habeas Corpus

## COUNSEL

Anthony J. Dain, under appointment by the Supreme Court, and Eric R. Larson for Defendant and Appellant.

# 827

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Donald E. De Nicola, Jaime L. Fuster and Thomas C. Hsieh, Deputy Attorneys General, for Plaintiff and Respondent.

Tony Rackauckas, District Attorney (Orange), Brian N. Gurwitz, Deputy District Attorney; Jan Scully, District Attorney (Sacramento), Albert C. Locher, Assistant Chief Deputy District Attorney; Steve Cooley, District Attorney (Los Angeles), George M. Palmer, Head Deputy District Attorney; and David R. LaBahn for California District Attorney's Association as Amicus Curiae on behalf of Plaintiff and Respondent.

## OPINION

**GEORGE, C. J.**—Defendant Jaleh Wilkinson was convicted at trial of the offenses of battery on a custodial officer, driving a vehicle under the influence of alcohol, and failing to stop at the scene of an accident. The Court of Appeal reversed defendant's convictions on two unrelated grounds, concluding that (1) the statutory scheme pertaining to battery on a custodial officer violates equal protection principles because the statutes allow battery on a custodial officer *without* injury to be punished more severely than battery on a custodial officer *with* injury, and (2) the trial court erred in denying defendant a hearing, pursuant to the *Kelly/Frye* doctrine (*People v. Kelly* (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240]; *Frye v. United States* (D.C. Cir. 1923) 54 App. D.C. 46 [293 F. 1013]), regarding the admissibility of polygraph evidence to support defendant's claim that her commission of the charged offenses resulted from her unknowing and involuntary ingestion of drugs. We granted review to consider the Court of Appeal's resolution of both issues.

For the reasons discussed below, we conclude that (1) the statutory provisions pertaining to battery on a custodial officer do not violate the equal protection clause of the state or federal Constitution, and (2) in light of the categorical prohibition on the admission of polygraph evidence in Evidence Code section 351.1, the trial court did not err in declining to hold a *Kelly/Frye* hearing regarding the evidence proffered by defendant. Accordingly, we shall reverse the judgment of the Court of Appeal.

## I

Defendant was charged by information with the offenses of battery on a custodial officer (Pen. Code, § 243.1), a felony, and with driving a vehicle

under the influence of alcohol (Veh. Code, § 23152, subd. (a)) and failing to stop at the scene of an accident (Veh. Code, § 20002, subd. (a)), both misdemeanors. At trial, the prosecution presented evidence that, in the early morning hours of February 27, 1999, a motorist observed defendant driving erratically on a street in the City of Santa Monica. Defendant's vehicle crossed over the center divider, struck a parked car, and continued down the street, swerving between lanes. Defendant eventually stopped her car at a curb and placed her head on the front passenger seat. After the motorist telephoned the police, officers responded and tapped on the window of defendant's parked car, whereupon defendant looked at one of the officers and drove off. The police gave chase for three blocks before defendant stopped. Defendant, who smelled strongly of alcohol and exhibited slurred speech, indicated she had consumed some drinks but not many. She could not complete a field sobriety test and did not respond when told she was required to submit to a blood or breath test for alcohol.

Officers transported defendant to the police station. She was belligerent during booking and resisted a patsearch. At one point, defendant grabbed a custodial officer's arm with both hands, causing a visible welt. When taken to a holding cell, defendant charged at an officer and yelled, kicked, and banged at the door. After the police reminded defendant that she would have to submit to a blood or breath test, defendant covered her ears, stated "I can't hear you," and began running around inside the cell. An officer testified defendant appeared to be under the influence of alcohol but not of drugs.

Defendant testified in her own defense as follows. On the night in question, defendant, a bank vice-president, went to a bar, where she met a man who offered to buy her a drink. She accepted and eventually consumed two glasses of wine. The man invited defendant to dinner, and they agreed to meet at a Santa Monica restaurant. At the restaurant, defendant consumed three alcoholic beverages over the course of three hours while she waited for the man, but he never arrived. She left her drink several times to use the restroom and to smoke a cigarette outside. She eventually left the restaurant, driving away without feeling any signs of intoxication. The next thing she remembered was waking up in jail, with no recollection of her encounter with the officers. After her release from custody, defendant filed a police complaint alleging she had been drugged.

A toxicologist, testifying on behalf of the defense, expressed the opinion that on the night in question defendant was under the influence of alcohol and gamma hydroxy butyrate (hereafter GHB), commonly known as a "date rape" drug, basing his opinion on a review of the police report and a videotape of

defendant's conduct in the holding cell. GHB depresses the nervous system, exaggerates the effects of alcohol, and may cause drowsiness and memory loss. Depending upon a person's personality, the drug may make a person more emotional and combative. The toxicologist also suggested that if defendant was not under the influence of GHB, she must have been visibly drunk when she left the restaurant in order for her to exhibit the effects of intoxication so long after her last drink. A City of Concord police officer, testifying for the defense as a drug recognition expert, stated that defendant's symptoms appeared much more severe than what would be expected of someone who had consumed five alcoholic drinks over the course of several hours.

Prior to trial, defendant sought admission of evidence establishing that she had submitted to a polygraph examination and that, in the opinion of the polygraph examiner, she had "passed" the exam, responding truthfully (in the negative) to queries regarding whether she knowingly consumed more than five drinks on the night in question, knowingly ingested GHB or any other drug, or knowingly attacked an officer in a detention cell. Defendant requested a *Kelly/Frye* hearing, making an offer of proof that the polygraph examination technique employed by the examiner had been generally accepted in the scientific community and that the examiner employed proper procedures in administering the test. The trial court declined to hold an evidentiary hearing, citing Evidence Code section 351.1.

The jury convicted defendant as charged, and the trial court placed defendant on formal probation for three years. The Court of Appeal reversed defendant's convictions, determining by a two-to-one vote that the statutory scheme pertaining to battery on a custodial officer violates equal protection principles, and unanimously concluding that the trial court erred by failing to hold a *Kelly/Frye* hearing regarding the admissibility of defendant's proffered polygraph evidence. We granted the Attorney General's petition for review as to both issues.[1]

---

[1] Defendant filed a petition for a writ of habeas corpus, which the Court of Appeal considered concurrently with her appeal. She claimed in that petition that her trial counsel rendered ineffective assistance by counseling her to reject a plea agreement that would have allowed her to plead guilty to two misdemeanor counts and serve no jail time, by rejecting a plea offer without consulting defendant, and by misinforming her regarding the admissibility of evidence. Defendant declared she faced deportation to Iran as a result of her felony conviction. The Court of Appeal issued an order to show cause in the habeas corpus matter, returnable before the trial court. Because no issue has been presented here regarding defendant's habeas corpus claims, we do not address them.

## II

### A

■ Defendant was convicted of violating Penal Code section 243.1,[2] which states in full: "When a battery is committed against the person of a custodial officer as defined in Section 831 of the Penal Code, and the person committing the offense knows or reasonably should know that the victim is a custodial officer engaged in the performance of his or her duties, and the custodial officer is engaged in the performance of his or her duties, the offense shall be punished by imprisonment in the state prison." Section 831, subdivision (a), in turn, defines a "custodial officer" as "a public officer, not a peace officer, employed by a law enforcement agency of a city or county who has the authority and responsibility for maintaining custody of prisoners and performs tasks related to the operation of a local detention facility used for the detention of persons usually pending arraignment or upon court order either for their own safekeeping or for the specific purpose of serving a sentence therein." Because section 243.1 provides for a punishment of imprisonment in state prison, but does not otherwise specify the term of imprisonment, under section 18 the offense is punishable "by imprisonment in any of the state prisons for 16 months, or two or three years . . . ."

At the time section 243.1 was enacted in 1976, *section 243* prescribed the punishment (1) for simple battery (which section 243 made punishable as a misdemeanor), (2) for battery against a person who the defendant knew or should have known was a "peace officer or fireman engaged in the performance of his duties" (which section 243 made punishable as either a felony or a misdemeanor, commonly known as a "wobbler"), and (3) for battery resulting in the infliction of "serious bodily injury" (which section 243 also made punishable as a wobbler, prescribing a punishment of two, three, or four years' imprisonment for a felony violation).[3] (Stats. 1976, ch. 1139, § 150.5, pp. 5104–5105.)

---

[2] Subsequent statutory references are to the Penal Code unless otherwise indicated.

Because section 243.1 was amended without substantive change after the commission of the present offenses, we consider the current version of that statute.

[3] Section 243 then stated in relevant part: "A battery is punishable by fine of not exceeding one thousand dollars ($1,000), or by imprisonment in the county jail not exceeding six months, or by both. When it is committed against the person of a peace officer or fireman, and the person committing the offense knows or reasonably should know that such victim is a peace officer or fireman engaged in the performance of his duties, and such peace officer or fireman is engaged in the performance of his duties, the offense shall be punished by imprisonment in the county jail not exceeding one year or by imprisonment in the state prison. When it is committed against a person and serious bodily injury is inflicted on such person, the offense shall be punished by imprisonment in the county jail for a period of not more than one year or imprisonment in the state prison for two, three, or four years." (Stats. 1976, ch. 1139, § 150.5, p. 5104.) Section 243 later was amended to provide expressly that a felony violation involving a peace officer or fireman could be punished by imprisonment in the state prison for 16 months or two or three years. (Stats. 1980, ch. 1340, § 2.2, p. 4719.)

In 1981, the Legislature divided section 243 into subdivisions, with subdivision (a) covering simple battery (punishable as a misdemeanor with a maximum jail sentence of six months), subdivision (b) covering battery on a person who the defendant knows or should know is a peace officer, firefighter, etc. (punishable as a misdemeanor with a maximum jail sentence of one year), subdivision (c) covering battery on a peace officer, firefighter, etc., that results in the infliction of injury (a wobbler with a possible state prison term of 16 months, two years, or three years), and subdivision (d) covering battery that results in serious bodily injury (a wobbler with a possible prison term of two, three, or four years). (Stats. 1981, ch. 678, § 2, pp. 2476–2477.) The following year, in 1982, the Legislature added a reference to custodial officers to subdivisions (b) and (c) of section 243, defining custodial officers by reference to section 831. (Stats. 1982, ch. 1353, § 2, pp. 5048–5050; see current § 243, subd. (f)(6).) Thus, as amended in 1982, section 243, subdivision (b), provided that battery on a person who the defendant knows or reasonably should know is a custodial officer is punishable as a misdemeanor with a maximum imprisonment of one year in county jail, and section 243, subdivision (c), provided that when such a battery results in injury to the custodial officer, the offense is punishable as a wobbler with possible imprisonment in state prison for 16 months, two years, or three years. Although the Legislature subsequently designated former section 243, subdivision (c), as current section 243, subdivision (c)(1) (with section 243, subdivision (c)(2), now covering battery on a peace officer or security guard with injury), the scheme of section 243 with respect to battery on a custodial officer has not been substantively changed since 1982.[4]

---

[4] Section 243, like section 243.1, was amended without substantive change subsequent to the commission of the present offenses. In its current form, section 243, subdivision (b) provides in full: "When a battery is committed against the person of a peace officer, custodial officer, firefighter, emergency medical technician, lifeguard, process server, traffic officer, code enforcement officer, or animal control officer engaged in the performance of his or her duties, whether on or off duty, including when the peace officer is in a police uniform and is concurrently performing the duties required of him or her as a peace officer while also employed in a private capacity as a part-time or casual private security guard or patrolman, or a nonsworn employee of a probation department engaged in the performance of his or her duties, whether on or off duty, or a physician or nurse engaged in rendering emergency medical care outside a hospital, clinic, or other health care facility, and the person committing the offense knows or reasonably should know that the victim is a peace officer, custodial officer, firefighter, emergency medical technician, lifeguard, process server, traffic officer, code enforcement officer, or animal control officer engaged in the performance of his or her duties, nonsworn employee of a probation department, or a physician or nurse engaged in rendering emergency medical care, the battery is punishable by a fine not exceeding two thousand dollars ($2,000), or by imprisonment in a county jail not exceeding one year, or by both that fine and imprisonment."

Section 243, subdivision (c)(1) currently provides: "When a battery is committed against a custodial officer, firefighter, emergency medical technician, lifeguard, process server, traffic officer, or animal control officer engaged in the performance of his or her duties, whether on or off duty, or a nonsworn employee of a probation department engaged in the performance of his

## B

On appeal, defendant contended in relevant part that the current statutory scheme pertaining to battery on a custodial officer is "irrational" and violates the federal and state guarantees of equal protection because one who commits the "lesser" offense of battery on a custodial officer *without* injury can receive felony punishment under section 243.1 while a person committing the "greater" offense of battery on a custodial officer *with* injury can be convicted of a wobbler offense under section 243, subdivision (c)(1) and can receive a misdemeanor sentence.

A majority of the Court of Appeal below agreed with defendant, reasoning: "If the battery on custodial officer statutes included only two options, a straight felony under section 243.1 or a straight misdemeanor under section 243, subdivision (b), both of which have identical elements, prosecutorial discretion to choose different punishment between offenders engaging in similar conduct would not violate equal protection . . . . [¶] What is troubling about our scheme, however, is its inclusion of a third charging option, the wobbler under section 243, subdivision (c)(1), which contains the additional requirement of infliction of an injury. . . . This third option raises the specter of complete irrationality in the scheme, because the *more serious* offense of battering a custodial officer with injury could be punished *less seriously* (an alternative felony/misdemeanor) than battering a custodial officer without injury (a straight felony under section 243.1)." Because the "greater" offense can be punished less severely, the majority found the scheme "is not even rationally related to a scheme which would give prosecutors the entire range

or her duties, whether on or off duty, or a physician or nurse engaged in rendering emergency medical care outside a hospital, clinic, or other health care facility, and the person committing the offense knows or reasonably should know that the victim is a nonsworn employee of a probation department, custodial officer, firefighter, emergency medical technician, lifeguard, process server, traffic officer, or animal control officer engaged in the performance of his or her duties, or a physician or nurse engaged in rendering emergency medical care, and an injury is inflicted on that victim, the battery is punishable by a fine of not more than two thousand dollars ($2,000), by imprisonment in a county jail not exceeding one year, or by both that fine and imprisonment, or by imprisonment in the state prison for 16 months, or two or three years." "Injury" is defined as "any physical injury which requires professional medical treatment." (§ 243, subd. (f)(5).)

Section 243, subdivision (d) currently provides: "When a battery is committed against any person and serious bodily injury is inflicted on the person, the battery is punishable by imprisonment in a county jail not exceeding one year or imprisonment in the state prison for two, three, or four years." "Serious bodily injury," for purposes of this provision, is defined as "a serious impairment of physical condition, including, but not limited to, the following: loss of consciousness; concussion; bone fracture; protracted loss or impairment of function of any bodily member or organ; a wound requiring extensive suturing; and serious disfigurement." (§ 243, subd. (f)(4).)

of punishments" and "encourages arbitrary, irrational charging" because prosecutors have an incentive to prove the "lesser" offense in order to obtain the greater punishment.

The dissent found no equal protection violation, questioning whether there is substantial evidence that the custodial officer here suffered an "injury" so as to allow a wobbler charge under section 243, subdivision (c)(1). The dissent also questioned whether a battery without injury necessarily was a less serious offense than battery with injury such that greater punishment for the former offense could not be imposed without violating equal protection principles.

### C

We begin our discussion with an overview of relevant case authority. Although the precise issue before us has not previously been addressed, at least two cases have discussed the legislative history surrounding the statutory scheme pertaining to battery on a custodial officer. In *In re Rochelle B.* (1996) 49 Cal.App.4th 1212 [57 Cal.Rptr.2d 851], the juvenile court sustained a wardship petition, finding true the allegation that the minor committed battery on a custodial officer under section 243.1. The minor challenged the finding on appeal, contending that a juvenile probation counselor was not a "custodial officer" within the meaning of sections 831 and 243.1. The Court of Appeal described in detail the legislative history of section 243.1, as well as the inclusion of "custodial officers" within section 243. The court observed: "A report of the Assembly Committee on Criminal Justice suggested the bill 'should be amended to delete Section 243.1 of the Penal Code which is a special section referring only to custodial officers,' apparently to avoid the resulting duplication in provisions setting out aggravated penalties for batteries against 'custodial officers.' [Citation.] This suggestion was evidently ignored, with the result that two separate statutes now provide somewhat different punishments for batteries against custodial officers." (*In re Rochelle B., supra,* 49 Cal.App.4th at p. 1217, fn. omitted.)

In *People v. Chenze* (2002) 97 Cal.App.4th 521, 525 [118 Cal.Rptr.2d 362] (*Chenze*), the defendant contended that he was improperly charged and convicted under section 243.1 because that provision had been "impliedly repealed" when the Legislature amended section 243 to include references to custodial officers. The defendant urged that the two statutes were in "irreconcilable conflict" since "[t]he older statute, section 243.1, provides that any battery against a custodial officer is a felony," whereas "the more recent statute [i.e., section 243, subdivision (c)(1)] permits felony treatment only if injury is inflicted." (*Chenze, supra,* 97 Cal.App.4th at p. 526.)

The Court of Appeal in *Chenze* disagreed that the two statutes were in irreconcilable conflict and thus rejected the claim of implied repeal. The court cited an enrolled bill report prepared by the California Youth and Adult Correctional Agency, which explained the need for an amendment to section 243 to include references to custodial officers notwithstanding the existence of section 243.1: " 'According to the bill's sponsors, simple battery charges against custodial officers are rarely pursued by local prosecutors because the present law only provides for felony charges with imprisonment in a state prison. Thus, these violators are rarely, if ever, punished. [¶] By providing for the option of county jail and/or fine for such violations, proponents hope that simple battery charges will be prosecuted more vigorously. Felony battery charges can still be pursued for the more serious cases.' [Citation.]" (*Chenze, supra,* 97 Cal.App.4th at p. 527.) In light of this legislative history, the court in *Chenze* rejected the defendant's claim of irreconcilable conflict, reasoning: "In view of the fact that the Legislature amended section 243 to include custodial officers when it was aware of section 243.1, it is apparent the Legislature intended to give prosecutors a full panoply of prosecutorial options for a battery on a custodial officer. Under section 243, the offense may be punished as a misdemeanor (§ 243, subd. (b)), or a misdemeanor or felony if injury is inflicted (§ 243, subd. (c)(1)). But the Legislature also apparently envisioned that there might be circumstances under which no or only slight injury was inflicted, but felony charges would nonetheless still be appropriate. Accordingly, it did not repeal section 243.1, and has very recently amended it." (*Ibid.*) Although the defendant in *Chenze* pointed out that under section 243.1 *all* batteries on custodial officers are punished as felonies while under section 243, subdivision (c)(1), only batteries involving injury may be so punished, the Court of Appeal observed that " '[i]t is axiomatic the Legislature may criminalize the same conduct in different ways . . .' " and the "prosecutor has discretion to proceed under either of two statutes that proscribe the same conduct, but which prescribe different penalties. (*United States v. Batchelder* (1979) 442 U.S. 114, 123–125 [60 L.Ed.2d 755, 99 S.Ct. 2198, 2203–2205] [(*Batchelder*)]" (*Chenze, supra,* 97 Cal.App.4th at p. 528.)

The United States Supreme Court's decision in *Batchelder, supra,* 442 U.S. 114, cited in *Chenze,* concluded that the defendant properly could be sentenced under one federal firearms statute, although an almost identical statute prescribed a lesser punishment. In *Batchelder,* the court took note of legislative history indicating that Congress "intended to enact two independent gun control statutes, each fully enforceable on its own terms . . . ." (*Batchelder, supra,* 442 U.S. at p. 119.) The court in *Batchelder* then stated that "[t]his Court has long recognized that when an act violates more than one criminal statute, the Government may prosecute under either so long as it does not discriminate against any class of defendants" (*id.* at pp. 123–124). The high

court concluded that the statutory scheme at issue fell under this rule: "[T]here is no appreciable difference between the discretion a prosecutor exercises when deciding whether to charge under one of two statutes with different elements and the discretion he exercises when choosing one of two statutes with identical elements. In the former situation, once he determines that the proof will support conviction under either statute, his decision is indistinguishable from the one he faces in the latter context. The prosecutor may be influenced by the penalties available upon conviction, but this fact, standing alone, does not give rise to a violation of the Equal Protection or Due Process Clause." (*Id.* at p. 125.)

We recently applied *Batchelder* in *Manduley v. Superior Court* (2002) 27 Cal.4th 537 [117 Cal.Rptr.2d 168, 41 P.3d 3] (*Manduley*), in rejecting an equal protection challenge to Welfare and Institutions Code section 707, subdivision (d), as amended by Proposition 21. In relevant part, section 707, subdivision (d) was amended to expand the circumstances under which the prosecution may file criminal charges directly in adult court without first filing a wardship petition in the juvenile court and having that court conduct a fitness hearing to determine whether the matter should remain in juvenile court. The minors alleged that the amended provision violated equal protection principles because "minors of the same age and charged with the same crime under the circumstances enumerated in section 707 [subdivision (d)] are subject either to the juvenile court law or to the criminal justice system, based solely upon a prosecutorial decision that is unguided by any statutory standards." (*Manduley, supra,* 27 Cal.4th at p. 567.)

In *Manduley* we rejected this claim, reasoning in part: "[A]ll minors who meet the criteria enumerated in [Welfare and Institutions Code] section 707[, subdivision] (d) equally are subject to the prosecutor's discretion whether to file charges in criminal court. Any unequal treatment of such minors who commit the same crime under similar circumstances results solely from the decisions of individual prosecutors whether to file against particular minors a petition in juvenile court or instead an accusatory pleading in criminal court. Although, as petitioners assert, a prosecutor's decision in this regard can result in important consequences to the accused minor, so does a decision by a prosecutor to initiate criminal charges against *any* individual, including an adult." (*Manduley, supra,* 27 Cal.4th at p. 568.) We explained in *Manduley* that "petitioners cannot establish a violation of their right to the equal protection of the laws by showing that other minors in circumstances similar to those of petitioners can be prosecuted under the juvenile court law" (*id.* at p. 570), likening a prosecutor's discretion to file adult criminal charges (instead of a juvenile court petition) to a prosecutor's discretion to bring charges under statutes proscribing similar conduct but with differing penalties (see *id.* at pp. 569–570). Accordingly, our decision in *Manduley* concluded that the "prosecutor's discretion to select those statutorily eligible cases in

which to seek a criminal disposition against a minor—based upon permissible factors such as the circumstances of the crime, the background of the minor, or a desire to show leniency, for example—does not violate the equal protection clause." (*Id.* at p. 571.)

## D

The Attorney General contends the statutory scheme before us does not violate equal protection principles because all persons who commit battery on a custodial officer are subject to the same statutory scheme and are not treated differently. He asserts that any possible disparate treatment results from charging decisions of prosecutors that, under *Batchelder* and *Manduley*, do not violate equal protection principles. The Attorney General further argues that in resolving the equal protection issue, we should conduct so-called rational basis review and find that there exists a rational basis for the statutory scheme at issue.

Defendant argues, in contrast, that so-called strict scrutiny should apply to the equal protection question at issue, because the present classification involves the "fundamental interest" of the "right to liberty." Further, defendant contends that even assuming that rational basis review applies, the Court of Appeal majority properly concluded that the statutory scheme before the court was irrational because it allows one who commits the "greater" offense (battery on a custodial officer with injury) to be punished less severely than one who commits the "lesser" offense (battery on a custodial officer without injury).

■ It is a fundamental principle that, "[t]o succeed on [a] claim under the equal protection clause, [a defendant] first must show that the state has adopted a classification that affects two or more similarly situated groups in an unequal manner." (*Manduley, supra,* 27 Cal.4th at p. 568; see *In re Eric J.* (1979) 25 Cal.3d 522, 530 [159 Cal.Rptr. 317, 601 P.2d 549].) ■ "In considering whether state legislation violates the Equal Protection Clause of the Fourteenth Amendment . . . we apply different levels of scrutiny to different types of classifications. At a minimum, a statutory classification must be rationally related to a legitimate governmental purpose. [Citations.] Classifications based on race or national origin . . . and classifications affecting fundamental rights . . . are given the most exacting scrutiny. Between these extremes of rational basis review and strict scrutiny lies a level of intermediate scrutiny, which generally has been applied to discriminatory classifications based on sex or illegitimacy. [Citations.]" (*Clark v. Jeter* (1988) 486 U.S. 456, 461 [100 L.Ed.2d 465, 108 S.Ct. 1910]; see also *Manduley, supra,* 27 Cal.4th at p. 571 ["equal protection provisions in the California Constitution 'have been generally thought . . . to be substantially

equivalent of the equal protection clause of the Fourteenth Amendment to the United States Constitution.' " (Fn. omitted.)].)

Defendant relies upon *People v. Olivas* (1976) 17 Cal.3d 236 [131 Cal.Rptr. 55, 551 P.2d 375] and its progeny for her claim that the strict scrutiny standard applies in the situation before us. The court in *Olivas* considered an equal protection challenge to a statute that granted a trial court discretion to commit a defendant who was convicted in an adult criminal prosecution, and was between 16 and 21 years of age, to the California Youth Authority for a term longer than he or she would have received had the defendant been sentenced as an adult. Concluding that "personal liberty" constitutes a fundamental right that triggers application of the strict scrutiny standard, *Olivas* stated: "No reason has been suggested, nor can we conceive of any, why the concern for personal liberty implicit in both the California and federal Constitutions is any less compelling in defendant's case. We believe that those charters are no less vigilant in protecting against continuing deprivations of liberty than are their due process clauses in protecting against the initial deprivation of that liberty. We conclude that personal liberty is a fundamental interest, second only to life itself, as an interest protected under both the California and United States Constitutions." (*Id.* at pp. 250–251; see also *People v. Jacobs* (1984) 157 Cal.App.3d 797, 800–801 [204 Cal.Rptr. 234] [following *Olivas* and applying strict scrutiny to an equal protection challenge to a prior-prison-term enhancement statute]; *People v. Gonzalez* (1978) 81 Cal.App.3d 274, 277 [146 Cal.Rptr. 417] [citing *Olivas* for the proposition that "[c]lassifications which deal with restraints upon personal liberty are subject to the strict scrutiny test applicable to equal protection of fundamental interests."].)

■ The language in *Olivas* could be interpreted to require application of the strict scrutiny standard whenever one challenges upon equal protection grounds a penal statute or statutes that authorize different sentences for comparable crimes, because such statutes always implicate the right to "personal liberty" of the affected individuals. Nevertheless, *Olivas* properly has not been read so broadly. As the court observed in *People v. Davis* (1979) 92 Cal.App.3d 250 [154 Cal.Rptr. 817]: "It appears . . . that the *Olivas* court did not want to increase substantially the degree of judicial supervision of the Legislature's criminal justice policies. Such a highly intrusive judicial reexamination of legislative classifications is not merited by a close reading of *Olivas*. There is language in the *Olivas* opinion that emphasizes the narrowness of the holding. For instance, the court noted that [the statute in question] was constitutionally infirm because persons committed under the statute had been 'prosecuted *as adults*, adjudged by the same standards which apply to *any competent adult*, and convicted *as adults in adult courts*.' ([*Olivas, supra*,] 17 Cal.3d at pp. 242–243.) This language requires only that the boundaries between the adult and juvenile criminal justice systems be

rigorously maintained. We do not read *Olivas* as requiring the courts to subject all criminal classifications to strict scrutiny requiring the showing of a compelling state interest therefor." (*Davis, supra,* 92 Cal.App.3d at p. 258.) Other courts similarly have concluded that a broad reading of *Olivas,* as advocated by defendant here, would "intrude[] too heavily on the police power and the Legislature's prerogative to set criminal justice policy." (*People v. Bell* (1996) 45 Cal.App.4th 1030, 1049 [53 Cal.Rptr.2d 156]; see *People v. Owens* (1997) 59 Cal.App.4th 798, 802 [69 Cal.Rptr.2d 428] ["California courts have never accepted the general proposition that 'all criminal laws, because they may result in a defendant's incarceration, are perforce subject to strict judicial scrutiny,'" quoting *People v. Silva* (1994) 27 Cal.App.4th 1160, 1167 [33 Cal.Rptr.2d 181]]; *People v. Mitchell* (1994) 30 Cal.App.4th 783, 796 [36 Cal.Rptr.2d 150] ["Determining gradations of culpability . . . does not implicate the strict scrutiny test for equal protection purposes."].)

■ We find the rational basis test applicable here. Defendant contends that the statutory scheme regarding battery on a custodial officer violates equal protection principles because it allows the "lesser" offense of battery without injury to be punished more severely than the "greater" offense of battery with injury. A defendant, however, "does not have a fundamental interest in a specific term of imprisonment or in the designation a particular crime receives." (*People v. Flores* (1986) 178 Cal.App.3d 74, 88 [223 Cal.Rptr. 465]; see *People v. Alvarez* (2001) 88 Cal.App.4th 1110, 1116 [106 Cal.Rptr.2d 447] [finding the rational basis test applicable to equal protection challenge involving "an alleged sentencing disparity"].) Defendant makes no claim that the classification here at issue involves a suspect class, nor does her claim implicate any interest akin to that at issue in *Olivas,* in which an individual faced a longer period of confinement if treated as a juvenile rather than as an adult. Application of the strict scrutiny standard in this context would be incompatible with the broad discretion the Legislature traditionally has been understood to exercise in defining crimes and specifying punishment.

■ Turning to the merits of defendant's claim, we find it unpersuasive. *Batchelder* instructs us that neither the existence of two identical criminal statutes prescribing different levels of punishments, nor the exercise of a prosecutor's discretion in charging under one such statute and not the other, violates equal protection principles. (*Batchelder, supra,* 442 U.S. at pp. 124–125.) ■ Thus, defendant may not complain that she was charged with a felony violation under section 243.1 even though section 243, subdivision (b) is an identical statute prescribing a lesser punishment. As we observed in *Manduley,* numerous factors properly may enter into a prosecutor's decision to charge under one statute and not another, such as a defendant's background and the severity of the crime, and so long as there is

no showing that a defendant "has been singled out deliberately for prosecution on the basis of some invidious criterion," that is, " 'one that is arbitrary and thus unjustified because it bears no rational relationship to legitimate law enforcement interests[,]' " the defendant cannot make out an equal protection violation. (*Manduley, supra,* 27 Cal.4th at pp. 568–569.) Defendant "does not allege that [her] prosecution was motivated by improper considerations." (*Batchelder, supra,* 442 U.S. at p. 125, fn. 9.)

Defendant, citing section 243, subdivision (c)(1), claims that the statutory scheme is irrational, based on her assertion that under the current scheme the "lesser" offense of battery on a custodial officer without injury may be punished more severely than the "greater" offense of battery on a custodial officer with injury. Defendant's assertion is based upon the questionable premise that battery on a custodial officer without injury always is a less serious offense than battery with injury, so as to warrant inevitably a lesser punishment. The dissent below questioned whether a hypothetical defendant "who, in the course of grabbing the arm of a correctional officer, inflicts a puncture wound with her fingernail that requires medical attention" would be more culpable "than a defendant who repeatedly hits and kicks the correctional officer, intending to cause serious injury but does not do so through no lack of effort." As recounted by the court in *Chenze,* the Legislature amended section 243 to include references to custodial officers while simultaneously not repealing section 243.1. The legislative history of the amendment suggests the amendment was intended to allow misdemeanor prosecutions of batteries committed on custodial officers, and the Legislature did not repeal section 243.1 to allow felony prosecutions for more serious cases, even if no injury was inflicted. (See *Chenze, supra,* 97 Cal.App.4th at p. 527.) The Legislature's actions tend to demonstrate it contemplated that the ostensible "lesser" offense of battery without injury sometimes may constitute a more serious offense and merit greater punishment than the "greater" offense of battery accompanied by injury.

■ Another premise underlying defendant's claim of irrationality that the current statutory scheme allows battery on a custodial officer, without injury, to be punished "more severely" than battery with injury appears somewhat questionable. As noted, a person who commits battery on a custodial officer, without injury, faces the same maximum imprisonment under section 243.1 as one who commits battery on a custodial officer with injury under section 243, subdivision (c)(1), namely state imprisonment for 16 months, two years, or three years.[5] Similarly, a person who does not inflict injury may be prosecuted under section 243, subdivision (b) and receive a misdemeanor sentence, the same sentence that a person who does inflict injury may receive

---

[5] A person prosecuted under section 243, subdivision (c)(1) faces an additional fine of up to $2,000 which that person would not face under section 243.1.

under section 243, subdivision (c)(1). The only difference between sections 243.1 and 243, subdivision (b) on the one hand, and section 243, subdivision (c)(1) on the other, is that, because section 243, subdivision (c)(1) is a wobbler, a trial court has discretion at sentencing either to impose misdemeanor punishment or grant probation and later, upon the defendant's successful completion of probation, declare the offense to be a misdemeanor. (§ 17, subd. (b)(1), (3).) A magistrate also has discretion at the preliminary hearing to determine that a wobbler offense is a misdemeanor. (§ 17, subd. (b)(5).)[6]

█ The circumstance that the Legislature did not grant to the trial court the same discretion in prosecutions under section 243.1 to reduce the charge to a misdemeanor as it did for prosecutions under section 243, subdivision (c) does not render the statutory scheme unconstitutional. A rational basis for these statutes exists; the Legislature reasonably could have concluded that reduction of the section 243.1 offense is not appropriate in cases of a battery on a custodial officer that is deemed serious enough by the prosecutor to warrant felony prosecution under the latter statute. █ As the Legislature properly may eliminate a trial court's discretion to dismiss an action or strike an allegation in furtherance of justice (see *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497, 518 [53 Cal.Rptr.2d 789, 917 P.2d 628]; *People v. Thomas* (1992) 4 Cal.4th 206, 209–214 [14 Cal.Rptr.2d 174, 841 P.2d 159]), so too may it by defining an offense as a straight felony deny a trial court discretion to reduce an offense to a misdemeanor. "It is the prerogative, indeed the duty, of the Legislature to recognize degrees of culpability when drafting a Penal Code." (*Michael M. v. Superior Court* (1979) 25 Cal.3d 608, 613 [159 Cal.Rptr. 340, 601 P.2d 572] [rejecting an equal protection challenge against the statutory rape law].) As stated in *People v. Flores, supra,* 178 Cal.App.3d 74: "The decision of how long a particular term of punishment should be is left properly to the Legislature. The Legislature is responsible for determining which class of crimes deserves certain punishments and which crimes should be distinguished from others. As long as the Legislature acts rationally, such determinations should not be disturbed." (*Id.* at p. 88 [finding the Legislature did not violate equal protection principles by not dividing the crime of attempted murder into

---

[6] Section 17, subdivision (b) states in relevant part: "When a crime is punishable, in the discretion of the court, by imprisonment in the state prison or by fine or imprisonment in the county jail, it is a misdemeanor for all purposes under the following circumstances: [¶] (1) After a judgment imposing a punishment other than imprisonment in the state prison. [¶] . . . [¶] (3) When the court grants probation to a defendant without imposition of sentence and at the time of granting probation, or on application of the defendant or probation officer thereafter, the court declares the offense to be a misdemeanor. [¶] . . . [¶] (5) When, at or before the preliminary examination . . . the magistrate determines that the offense is a misdemeanor, in which event the case shall proceed as if the defendant had been arraigned on a misdemeanor complaint."

degrees].) Because a rational basis exists for the statutory scheme pertaining to battery on a custodial officer, these statutes are not vulnerable to challenge under the equal protection clause. (See *People v. Romo* (1975) 14 Cal.3d 189, 196–197 [121 Cal.Rptr. 111, 534 P.2d 1015] [rejecting equal protection challenge based upon the claim that assault could be punished more severely than the greater offense of assault with intent to commit murder].)[7]

---

[7] In arguing that the existing statutory scheme is irrational and violates equal protection principles, the concurring and dissenting opinion states that prosecutors would have no incentive to charge a defendant with a wobbler under section 243, subdivision (c), because that provision requires proof of the additional element of injury and prescribes a "lesser" penalty than that provided for a violation of the straight felony of section 243.1. This point misjudges the significance of the United States Supreme Court's holding in *Batchelder, supra,* 442 U.S. 114, 123–125, that the existence of two statutes covering the same criminal conduct but carrying different penalties does not violate either equal protection or due process principles, even though a prosecutor may be influenced by the different penalties available upon conviction in determining under which statute to charge a defendant. Defendant in the present case cannot point to any harm that she suffered by virtue of the circumstance that section 243, subdivision (c), applies only to battery on a custodial officer with injury, inasmuch as she properly could have been charged under section 243.1 (even if section 243, subdivision (c), applied to battery on a custodial officer without injury) and persons who commit battery on a custodial officer with injury may be charged and punished under section 243.1. Further, the concurring and dissenting opinion's argument ignores the observation in *Chenze, supra,* 97 Cal.App.4th 521, 527, that the Legislature added the references to custodial officers in section 243 precisely to allow for prosecutions involving lesser punishments.

The concurring and dissenting opinion's observation that the prosecutor in this case twice offered to dismiss the section 243.1 charge pursuant to a plea agreement does not call into question our conclusion that the Legislature properly can eliminate a trial court's discretion to reduce a charge in cases deemed by the prosecutor to warrant felony treatment. Such offers may reflect the prosecutor's judgment regarding the benefits of avoiding the administrative burden and expense of a trial rather than reflecting an assessment by the prosecutor regarding the seriousness of the offense. In any event, the circumstance that a prosecutor may engage in plea negotiation regarding a section 243.1 offense does not establish that no rational basis exists for the Legislature to provide an alternative that does not afford a trial court discretion to reduce a charge when such plea negotiation fails. Further, because *any* battery on a custodial officer, whether with or without injury, may be prosecuted under section 243.1, the concurring and dissenting opinion's argument that no rational basis exists for eliminating the trial court's discretion to reduce the charge when a defendant is prosecuted for a straight felony under section 243.1 misses the mark.

In addition, contrary to the suggestion in the concurring and dissenting opinion, the present case does not involve any issue regarding necessarily included offenses, because there is no claim that section 243.1 is a necessarily included offense of section 243, subdivision (c), so that a jury must be instructed on section 243.1 when a defendant is charged under section 243, subdivision (c). Defendant was charged and the jury was instructed only under section 243.1. If a jury were to be instructed on a lesser necessarily included offense in a case in which the defendant is charged under the wobbler provision of section 243, subdivision (c), it appears that the lesser necessarily included offense that the jury would be instructed upon would be the misdemeanor offense prescribed by section 243, subdivision (b), rather than the felony offense prescribed by section 243.1.

## III

### A

With regard to the second issue before us, the Attorney General contends the Court of Appeal erred by remanding for a *Kelly/Frye* hearing, because Evidence Code section 351.1 establishes a categorical prohibition on the admission of polygraph evidence in criminal cases absent a stipulation. Subdivision (a) of section 351.1, which was enacted in 1983, provides: "Notwithstanding any other provision of law, the results of a polygraph examination, the opinion of a polygraph examiner, or any reference to an offer to take, failure to take, or taking of a polygraph examination, shall not be admitted into evidence in any criminal proceeding, including pretrial and post conviction motions and hearings, or in any trial or hearing of a juvenile for a criminal offense, whether heard in juvenile or adult court, unless all parties stipulate to the admission of such results."

As noted, prior to trial defendant filed a written motion seeking an evidentiary hearing to determine the admissibility of evidence tending to establish that she had "passed" a polygraph examination. Defendant indicated that at such hearing she would present testimony by "one or more experts" proving that polygraph examinations now were generally accepted in the scientific community within the meaning of the *Kelly/Frye* test. As an offer of proof, defendant explained that the polygraph expert who examined her utilized the "control question" method;[8] that defense experts would testify this method is accepted in the scientific community, as established by scientific studies; and that proper procedures were employed in administering the test under this method. Defendant also asserted that other jurisdictions have found polygraph evidence to be accepted in the scientific community. Defendant attached as an exhibit to her motion an issue of the journal Polygraph a publication of the American Polygraph Association (APA)

---

[8] "The control question technique involves basically two types of questions; control or comparison questions and relevant questions that specifically concern the investigation at hand. The control questions are designed to arouse the concern of the innocent subject and it is expected that the subject will react more strongly to them than to the relevant questions. The control questions deal with acts that are similar to the issue of the investigation. However, they are more general, cover long periods of time in the life history of the subject, and are deliberately vague. During the pretest review of the control questions, the examiner carefully introduces the control questions to the subject so that in answering these questions on the test the subject is likely to be deceptive or uncertain as to the truthfulness of his answers. In this way, the innocent subject will react more strongly to the control questions than to the relevant questions. On the other hand, guilty subjects who answer the relevant questions deceptively will be more concerned about being detected in that deception than with the control questions. Thus, it is the comparative reactivity rather than the absolute reactivity to a particular question that forms the basis for determining truth or deception." (*United States v. Galbreth* (D.N.M. 1995) 908 F.Supp. 877, 884.)

discussing the United States Supreme Court case of *United States v. Scheffer* (1998) 523 U.S. 303 [140 L.Ed.2d 413, 118 S.Ct. 1261] (still pending at the time this issue of the journal was published) and including the parties' briefs in *Scheffer* as well as an amicus curiae brief filed in that case by the APA. Defendant acknowledged that Evidence Code section 351.1 bars the admission of polygraph evidence in criminal proceedings unless all parties stipulate to its admission, but argued that this statutory provision improperly interfered with her federal constitutional right to present a defense. The trial court, declining to conduct an evidentiary hearing, held that under section 351.1 "the evidence is inadmissible, period, *Kelly* or otherwise."

On appeal, defendant contended that, notwithstanding the apparent categorical prohibition of Evidence Code section 351.1, she was entitled to a *Kelly/Frye* hearing to determine the admissibility of her proposed polygraph evidence under the reasoning of this court's decisions in *People v. Jackson* (1996) 13 Cal.4th 1164 [56 Cal.Rptr.2d 49, 920 P.2d 1254] (*Jackson*), and *People v. Fudge* (1994) 7 Cal.4th 1075 [31 Cal.Rptr.2d 321, 875 P.2d 36] (*Fudge*) (discussed *post*). The Court of Appeal agreed with defendant that she had "made a sufficient offer of proof to entitle her to a [*Kelly/Frye*] hearing" under the reasoning of *Jackson* and *Fudge*, observing that "we do not see what more such an offer would need to meet the threshold required to convene such a hearing." The court, concluding that the denial of a *Kelly/Frye* hearing prejudiced defendant, remanded the case to the trial court with directions to conduct such a hearing and to set aside defendant's convictions in the event the trial court "concludes the polygraph evidence is admissible."

**B**

Prior to the enactment of Evidence Code section 351.1, the admission of polygraph evidence in California was governed by the test of *Frye v. United States, supra,* 293 F. 1013. Under that test, one who seeks the admission of evidence based upon a new scientific technique must make "a preliminary showing of general acceptance of the new technique in the relevant scientific community." (*Kelly, supra,* 17 Cal.3d at p. 30; see *id.* at p. 32 ["reaffirm[ing] our allegiance" to the *Frye* " 'general acceptance' " test for new scientific techniques]; see also *People v. Leahy* (1994) 8 Cal.4th 587, 593–604 [34 Cal.Rptr.2d 663, 882 P.2d 321] [retaining the *Kelly/Frye* test as the applicable California standard and declining to adopt the new federal standard set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993) 509 U.S. 579 [125 L.Ed.2d 469, 113 S.Ct. 2786]].) Relying upon *Frye* and its progeny, a long line of California decisions has held or recognized that the results of a polygraph examination are inadmissible at trial absent a stipulation by the parties. (See *People v. Carter* (1957) 48 Cal.2d 737, 752 [312 P.2d

665] ["Lie detector tests do not as yet have enough reliability to justify the admission of expert testimony based on their results"]; *People v. Adams* (1975) 53 Cal.App.3d 109, 111–119 [125 Cal.Rptr. 518] [concluding results of polygraph test inadmissible at trial under doctrine of stare decisis and also because insufficiently reliable]; *People v. York* (1959) 174 Cal.App.2d 305, 311–312 [344 P.2d 811] [refusing to reexamine holdings of prior cases finding polygraph examination results inadmissible]; *People v. Porter* (1955) 136 Cal.App.2d 461, 470 [288 P.2d 561] [the trial court did not err in not ordering a lie detector test because the results were inadmissible at trial]; *People v. Porter* (1950) 99 Cal.App.2d 506, 510–511 [222 P.2d 151] [same case]; *People v. Wochnick* (1950) 98 Cal.App.2d 124, 127–128 [219 P.2d 70] [following *Frye* and finding that the " 'systolic blood pressure deception test' " has " 'not yet gained such standing and scientific recognition as to justify the admission of expert testimony . . . .' "]; see also *People v. Thornton* (1974) 11 Cal.3d 738, 763 [114 Cal.Rptr. 467, 523 P.2d 267] [noting "the results of [a polygraph] test are not admissible evidence in a court of law"]; *People v. Jones* (1959) 52 Cal.2d 636, 653 [343 P.2d 577] ["The courts have consistently held that whether the test is a polygraph test, or a sodium amytal or sodium pentothal test, the results are not such as to be admissible for or against the defendant because of a lack of scientific certainty about the results."]; *People v. Schiers* (1971) 19 Cal.App.3d 102, 108 [96 Cal.Rptr. 330]; *People v. Adams* (1960) 182 Cal.App.2d 27, 33 [5 Cal.Rptr. 795] [noting "the established rule that the *results* of lie detector tests are not admissible in evidence"]; *People v. Parrella* (1958) 158 Cal.App.2d 140, 147 [322 P.2d 83] ["There can be no doubt that evidence about the results of the lie detector test was inadmissible."]; *People v. Aragon* (1957) 154 Cal.App.2d 646, 658 [316 P.2d 370] [stating of polygraph examinations that "we know of no appellate decision sustaining its use in the trial of a criminal case in the absence of a stipulation"].)

The legal landscape in California changed with the Court of Appeal's opinion in *Witherspoon v. Superior Court* (1982) 133 Cal.App.3d 24 [183 Cal.Rptr. 615] (*Witherspoon*). The majority in *Witherspoon* criticized the judicial rule that consistently excludes polygraph evidence as "an almost 'knee jerk' response" "based more on considerations of policy rather than any demonstrated lack of reliability or acceptance of the test" considerations that the majority felt "are more properly matters for legislative rather than judicial determination." (*Id.* at pp. 29, 31.) The majority, not finding any provision in the Evidence Code expressly barring the admission of polygraph evidence, concluded the defendant was entitled to a hearing to determine the admissibility of the evidence, suggesting that the polygraph evidence should be admitted so long as the evidence was relevant (Evid. Code, § 210), its probative value was not substantially outweighed by the probability of undue prejudice (*id.*, § 352), and the defendant could satisfy the requirements for the

admission of expert testimony (*id.*, § 801 [expert opinion testimony]; see also *id.*, § 720 [qualification of expert witness]; *id.*, § 405 [determination of preliminary fact]). (*Witherspoon, supra,* at pp. 30–35.)

"It was in reaction to *Witherspoon* that the Legislature enacted Evidence Code section 351.1." (*People v. Kegler* (1987) 197 Cal.App.3d 72, 85 [242 Cal.Rptr. 897] (*Kegler*); *In re Kathleen W.* (1987) 190 Cal.App.3d 68, 72 [235 Cal.Rptr. 205].) The Assembly Committee on Criminal Law and Public Safety's analysis of the bill that became section 351.1 expressly stated the bill was " 'intended to overrule [*Witherspoon*] and to create an exception to the truth-in-evidence section of Proposition 8 that bars exclusion of any relevant evidence.' (Assembly Com. on Crim. Law and Pub. Safety, staff comments on Sen. Bill. No. 266 as amended Mar. 16, 1983 (1983–1984 Reg. Sess.), for hg. on June 8, 1983, p. 2.)" (*Kegler, supra,* 197 Cal.App.3d at p. 84.) Legislative history materials expressed concerns that (1) the *Witherspoon* procedure would " 'substantially increase trial time by requiring courts to litigate collateral issues regarding the reliability of the particular test and qualifications of the specific polygraph examiner in every case,' " (2) polygraph testing procedures lack standardization and cannot be tested for accuracy, and (3) jurors would " 'assign too much credence to the results of a polygraph examination.' " (*Kegler, supra,* 197 Cal.App.3d at p. 89.)

As past decisions make clear, the *Kelly/Frye* test constitutes a judicially created rule relating to the admissibility of certain types of evidence and, as such, a rule that is subject to legislative revision. (See, e.g., *People v. Leahy, supra,* 8 Cal.4th 587, 604 [taking note of legislative failure to abrogate or modify the general *Kelly/Frye* standard]; *Daubert v. Merrell Dow Pharmaceuticals, Inc., supra,* 509 U.S. 579, 585–589 [*Frye* test superseded in federal courts by the enactment of the Federal Rules of Evidence].) By enacting Evidence Code section 351.1, the Legislature abrogated the *Kelly/Frye* rule with respect to the admission of polygraph evidence in criminal cases. As noted, the Legislature enacted section 351.1 to overrule the then recently decided appellate court decision in *Witherspoon, supra,* 133 Cal.App.3d 24, which had criticized the routine application of the *Frye* test to exclude polygraph evidence and had suggested that such evidence could be admitted if the proponent made a showing of admissibility under certain provisions of the Evidence Code. Thus, in adopting Evidence Code section 351.1, the Legislature effectively codified the rule set forth in the pre-*Witherspoon* California cases involving polygraph evidence, namely that such evidence is categorically inadmissible in the absence of the stipulation of all parties.

This understanding of Evidence Code section 351.1 is consistent with numerous cases that subsequently have interpreted the statute to exclude

polygraph evidence categorically in criminal cases, absent the stipulation of the parties. (See *In re Aontae D.* (1994) 25 Cal.App.4th 167, 173 [30 Cal.Rptr.2d 176]; *Kegler, supra,* 197 Cal.App.3d at p. 84; *In re Kathleen W., supra,* 190 Cal.App.3d at p. 72.) Defendant concedes that this is the import of section 351.1, but she argues she nonetheless was entitled to a *Kelly/Frye* hearing under this court's precedents, in particular the decisions in *Jackson, supra,* 13 Cal.4th 1164, and *Fudge, supra,* 7 Cal.4th 1075 [31 Cal.Rptr.2d 321, 875 P.2d 36]. Insofar as section 351.1's categorical exclusion is applied to deprive her of the opportunity to demonstrate the current reliability of proffered polygraph evidence under the *Kelly/Frye* standard, defendant claims the statute infringes upon her right to present a defense at trial, in violation of the federal Constitution.[9]

## C

We first address defendant's claim that she was entitled to a *Kelly/Frye* hearing notwithstanding Evidence Code section 351.1. We begin with a review of the relevant portions of the decisions in *Jackson, supra,* 13 Cal.4th 1164, and *Fudge, supra,* 7 Cal.4th 1075, upon which defendant relies. In *Jackson,* the defendant, at the guilt phase of a capital trial, sought to present evidence that he had "passed" a polygraph test and had stated truthfully in the polygraph session that he had not killed the victim. (*Jackson, supra,* 13 Cal.4th at p. 1212.) The defendant in *Jackson* contended he was entitled to a *Kelly/Frye* hearing notwithstanding section 351.1, arguing that the statute's exclusion of such "reliable exculpatory evidence" denied him his right to due process of law under the federal Constitution. (*Jackson, supra,* 13 Cal.4th at p. 1212.) We rejected this claim, reasoning: "Even if defendant's argument were true in the abstract, he has failed to make the proper offer of proof under *Kelly/Frye* that the polygraph is now viewed in the scientific community as a reliable technique. ' ". . . Having failed to make the proper offer of proof, defendant is in no position to assign error in the trial court's ruling." ' " (*Ibid.,* quoting *Fudge, supra,* 7 Cal.4th at p. 1122.)

In *Fudge,* the defendant attempted to present evidence at the penalty phase of a capital trial that he had "passed" a polygraph examination, arguing that

---

[9] Although defendant's brief in this court contains a fleeting reference to "her rights to federal *and state* due process" in the *heading* of the brief's argument relating to the exclusion of polygraph evidence, her brief fails to cite any authority or present any argument relating to state constitutional due process principles. "[E]very brief should contain a legal argument with citation of authorities on the points made. If none is furnished on a particular point, the court may treat it as waived, and pass it without consideration. [Citations.]" (9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 594, p. 627; see also *People v. Stanley* (1995) 10 Cal.4th 764, 793 [42 Cal.Rptr.2d 543, 897 P.2d 481]; Cal. Rules of Court rules 14(a)(1)(B), 29.1(b)(1).) Because defendant's "unelaborated citation[]" to the state due process clause "add[s] nothing to [her] argument" (*People v. Yeoman* (2003) 31 Cal.4th 93, 118 [2 Cal.Rptr.3d 186, 72 P.3d 1166]), we " 'pass it without consideration' " (*Stanley, supra,* 10 Cal.4th at p. 793).

Evidence Code section 351.1 unconstitutionally deprived him of his right to present "relevant mitigating evidence." (*Fudge, supra,* 7 Cal.4th at pp. 1121, 1122.) *Fudge* rejected this claim: "Defendant, however, failed to present an offer of proof that polygraph evidence was generally accepted in the scientific community. We have previously held that such an offer of proof is necessary to preserve the issue for appeal. (*People v. Morris* (1991) 53 Cal.3d 152, 193 [279 Cal.Rptr. 720, 807 P.2d 949].) ' "Absent an offer of proof that the polygraph is now accepted in the scientific community as a reliable technique, the evidence was presumptively unreliable and inadmissible." ' " (*Fudge, supra,* 7 Cal.4th at p. 1122, quoting *People v. Harris* (1989) 47 Cal.3d 1047, 1094–1095 [255 Cal.Rptr. 352, 767 P.2d 619].) Other cases similarly have rejected federal constitutional challenges to section 351.1 because of the defendant's failure to make an offer of proof regarding the reliability of polygraph evidence. (See *People v. Burgener* (2003) 29 Cal.4th 833, 870–871 [129 Cal.Rptr.2d 747, 62 P.3d 1]; *People v. Koontz* (2002) 27 Cal.4th 1041, 1090 [119 Cal.Rptr.2d 859, 46 P.3d 335]; *People v. Ayala* (2000) 23 Cal.4th 225, 264 [96 Cal.Rptr.2d 682, 1 P.3d 3]; *People v. Price* (1991) 1 Cal.4th 324, 419 [3 Cal.Rptr.2d 106, 821 P.2d 610]; see also *People v. Maury* (2003) 30 Cal.4th 342, 413–414 [133 Cal.Rptr.2d 561, 68 P.3d 1] (*Maury*) [exclusion of polygraph evidence did not impair ability to present a defense].)

As the foregoing decisions demonstrate, defendant is correct in observing that, even after the enactment of Evidence Code section 351.1, we have required, as a prerequisite to preserving the claim for appeal, that a challenge to the constitutionality of this statute include an offer of proof that the proffered polygraph evidence is generally accepted under the *Kelly/Frye* standard. The constitutional challenges to section 351.1 raised in the foregoing cases generally have involved claims that the exclusion of polygraph evidence deprived a defendant of his or her right to present "reliable exculpatory evidence" at the guilt phase of a capital trial (see *Jackson, supra,* 13 Cal.4th at pp. 1212–1213), "relevant mitigating evidence" at the penalty phase (see *Fudge, supra,* 7 Cal.4th at pp. 1122–1123; see also *People v. Koontz, supra,* 27 Cal.4th at p. 1090), or impeachment evidence (see *People v. Burgener, supra,* 29 Cal.4th at pp. 870–871; *People v. Ayala, supra,* 23 Cal.4th at p. 264; *People v. Price, supra,* 1 Cal.4th at p. 419). Because the constitutional challenges to section 351.1's exclusion of polygraph evidence rest on the premise that the statute would abridge a defendant's federal and state constitutional rights to due process and to present a defense *only if* the proffered evidence were shown to be reliable, we have required those who would challenge section 351.1 on these grounds to make an adequate offer of proof regarding the reliability of polygraph evidence. And because the defendants in those prior cases failed to make the requisite offer of proof regarding the reliability of the proffered polygraph evidence, we did not have

the occasion to decide the substantive merits of the constitutional claims regarding the exclusion of polygraph evidence under section 351.1.

The Court of Appeal correctly concluded in the present case that defendant had preserved her constitutional challenge to section 351.1 by making her offer of proof regarding the reliability of polygraph evidence under *Kelly/Frye*. The court, however, went further and remanded the case to the trial court to conduct a *Kelly/Frye* hearing, directing the trial court to set aside the judgment if that court found the polygraph evidence to be "admissible" under the *Kelly/Frye* standard, that is, if defendant demonstrated at the hearing that the polygraph technique employed was generally accepted in the scientific community.

Although our past cases have determined that an offer of proof regarding the reliability of polygraph evidence is a prerequisite for raising a constitutional challenge against Evidence Code section 351.1's categorical exclusion, we never have held that such proof is sufficient by itself to make out such a claim, that is, we never have suggested that evidence that satisfies the *Kelly/Frye* test must, as a constitutional matter, be admitted in evidence notwithstanding the statutory provision barring such admission. Indeed, in our recent decision in *People v. Burgener, supra,* 29 Cal.4th 833, we cautioned: "Before a criminal defendant can establish a federal due process right to use the results of a polygraph examination, it is necessary *(although perhaps not sufficient)* to offer proof that the technique has become generally accepted in the scientific community." (*Id.* at p. 871, italics added.) Thus, the Court of Appeal erred by remanding the case for a *Kelly/Frye* hearing without specifically addressing the question whether section 351.1's categorical exclusion of polygraph evidence would be unconstitutional in the event defendant is able to satisfy the *Kelly/Frye* test. Because defendant has preserved her federal constitutional challenge to section 351.1, we now address that issue.

### D

The Attorney General contends that under the reasoning of *United States v. Scheffer, supra,* 523 U.S. 303, the categorical exclusion of polygraph evidence mandated by Evidence Code section 351.1 does not violate the federal Constitution. In that case, the United States Supreme Court rejected a constitutional challenge to Military Rules of Evidence, rule 707(a), which bans polygraph evidence in military trials.[10] The defendant, an airman who faced a military court-martial for alleged drug use, sought the admission of

---

[10] Military Rules of Evidence, rule 707(a) provides: "Notwithstanding any other provision of law, the results of a polygraph examination, the opinion of a polygraph examiner, or any reference to an offer to take, failure to take, or taking of a polygraph examination, shall not be admitted into evidence."

evidence that he had "passed" a polygraph examination, in order to bolster his testimony that he innocently had ingested the drugs. In a portion of the opinion authored by Justice Thomas and joined by seven other justices,[11] the high court noted that "there is simply no consensus that polygraph evidence is reliable," observing that this lack of consensus is "reflected in the disagreement among state and federal courts concerning both the admissibility and the reliability of polygraph evidence." (*United States v. Scheffer, supra,* 523 U.S. at pp. 309–311 (lead opn. of Thomas, J.).) In light of this circumstance, the court concluded that the per se exclusion of polygraph evidence "is a rational and proportional means of advancing the legitimate interest in barring unreliable evidence" and that "[i]ndividual jurisdictions therefore may reasonably reach differing conclusions as to whether polygraph evidence should be admitted. We cannot say, then, that presented with such widespread uncertainty, the President acted arbitrarily or disproportionately in promulgating a *per se* rule excluding all polygraph evidence." (*Id.* at p. 312.)

Justice Kennedy, in a concurring opinion joined by three other justices,[12] commented that the "continuing, good-faith disagreement among experts and courts on the subject of polygraph reliability counsels against our invalidating a *per se* exclusion of polygraph results," and "[g]iven the ongoing debate about polygraphs, I agree the rule of exclusion is not so arbitrary or disproportionate that it is unconstitutional." (*United States v. Scheffer, supra,* 523 U.S. at p. 318 (conc. opn. of Kennedy, J.).) Justice Kennedy, however, expressed doubt "that the rule of *per se* exclusion is wise, and some later case might present a more compelling case for introduction of the testimony than this one does." (*Ibid.*)

 We recently applied *Scheffer* in *Maury, supra,* 30 Cal.4th 342, in which the defendant sought the admission of evidence that he had " 'passed' " a polygraph examination, in order to bolster his claim that someone else had killed the victim. (*Id.* at p. 413.) We concluded that in light of *Scheffer,* "[e]xcluding such evidence does not violate defendant's constitutional right to present a defense." (*Ibid.*) Noting that "[i]mplicit in the Legislature's passage of Evidence Code section 351.1 is the conclusion that '[L]ie detector tests themselves are not considered reliable enough to have probative value' [Citations.]," and quoting *Scheffer,* we concluded that a "per se rule excluding

---

[11] Chief Justice Rehnquist and Justices O'Connor, Scalia, Kennedy, Souter, Ginsburg, and Breyer joined this portion of Justice Thomas's opinion in *Scheffer.* (See *United States v. Scheffer, supra,* 523 U.S. at pp. 309–311 (lead opn. of Thomas, J.); *id.* at p. 318 (conc. opn. of Kennedy, J.).)

[12] Justices O'Connor, Ginsburg, and Breyer joined Justice Kennedy's concurring opinion.

polygraph evidence is a 'rational and proportional means of advancing the legitimate interest in barring unreliable evidence.' (*Scheffer, supra,* at p. 312.)" (*Ibid.*)

We reach the same conclusion here. *Scheffer* noted that "the scientific community remains extremely polarized about the reliability of polygraph techniques." (*United States v. Scheffer, supra,* 523 U.S. at p. 309 (lead opn. of Thomas, J.).) With respect to the reliability of the "control question technique" employed in the present case, *Scheffer* observed that studies ran the gamut from showing an 87 percent accuracy rate to a rate " 'little better than could be obtained by the toss of a coin,' that is, 50 percent." (*Id.* at p. 310.) This disagreement in the scientific community in turn has been reflected "in the disagreement among state and federal courts concerning both the admissibility and the reliability of polygraph evidence." (*Id.* at pp. 310–311.)

Defendant cannot persuasively contend that between the time of the *Scheffer* decision and defendant's trial, a span of two and one-half years, the deep division in the scientific and legal communities regarding the reliability of polygraph evidence, as recognized by *Scheffer,* had given way to a general acceptance that would render the categorical exclusion of polygraph evidence "so arbitrary or disproportionate that it is unconstitutional." (*United States v. Scheffer, supra,* 523 U.S. at p. 318 (conc. opn. of Kennedy, J.).) Indeed, defense counsel conceded at oral argument that the disagreement within the scientific community regarding the reliability of polygraph evidence had not been significantly altered in that time period. Further, defendant's offer of proof in the trial court regarding the reliability of polygraph evidence consisted of a publication of the APA that outlined the studies and briefing presented in the *Scheffer* case—materials which the United States Supreme Court expressly considered and cited in *Scheffer* in concluding there existed no scientific consensus on the reliability of polygraph evidence in general and the control question technique in particular. Likewise, the legal authorities cited by defendant in the trial court as indicative of a "major reevaluation of the admissibility of polygraph evidence by the federal courts" all predate the *Scheffer* decision and, in any event, did not consider the constitutionality of a categorical exclusion of polygraph evidence. (See *United States v. Cordoba* (9th Cir. 1997) 104 F.3d 225, 227–229 [holding that the Ninth Circuit's per se ban on polygraph evidence, based upon *Frye,* was overturned by *Daubert v. Merrell Dow Pharmaceuticals, Inc., supra,* 509 U.S. 579, which concluded the Federal Rules of Evidence superceded the *Frye* "general acceptance" test in federal courts]; *United States v. Piccinonna* (11th Cir. 1989) 885 F.2d 1529, 1532–1537 [concluding there was no per se ban on polygraph evidence in the Eleventh Circuit]; *United States v. Galbreth, supra,* 908 F.Supp. 877,

890–896 [holding polygraph evidence admissible under the *Daubert* standard]; *United States v. Crumby* (D.Ariz. 1995) 895 F.Supp. 1354, 1358–1365 [same].) In light of the continuing division of opinion regarding the reliability of polygraph evidence, as recognized by *Scheffer*, the California Legislature has not acted "arbitrarily or disproportionately in promulgating [and retaining] a *per se* rule excluding all polygraph evidence." (*Scheffer, supra*, 523 U.S. at p. 312 (lead opn. of Thomas, J.); see *In re Aontae D., supra*, 25 Cal.App.4th at p. 177 [exclusion of polygraph evidence under Evidence Code section 351.1 does not deny due process]; *Kegler, supra*, 197 Cal.App.3d at p. 89 [same].)

Defendant contends the polygraph evidence she proffered was "critical to her defense" and thus exclusion of this evidence deprived her of the constitutional right to present a defense, citing *Rock v. Arkansas* (1987) 483 U.S. 44 [97 L.Ed.2d 37, 107 S.Ct. 2704] and *Chambers v. Mississippi* (1973) 410 U.S. 284 [35 L.Ed.2d 297, 93 S.Ct. 1038]. In *Rock*, the United States Supreme Court concluded that a per se rule excluding all hypnotically refreshed testimony infringed upon the defendant's constitutional right to testify, where the rule prevented the defendant from testifying regarding the circumstances underlying the charged killing, including whether it was accidental. (*Rock v. Arkansas, supra*, 483 U.S. at pp. 56–62.) The court in *Chambers* held that the defendant's constitutional right to present a defense was impaired by Mississippi's "voucher" rule, which prevented the defendant from impeaching a defense witness whom he alleged had committed the charged killing, coupled with application of the hearsay rule to exclude testimony that the witness had confessed to three persons. (*Chambers v. Mississippi, supra*, 410 U.S. at pp. 294–303; see also *Green v. Georgia* (1979) 442 U.S. 95, 96–97 [60 L.Ed.2d 738, 99 S.Ct. 2150] [due process denied by exclusion of hearsay evidence that a codefendant had confessed to committing the crime alone].)

These decisions do not assist defendant. *Scheffer* distinguished *Rock* and *Chambers*, finding that "unlike the evidentiary rules at issue in those cases, [the rule excluding polygraph evidence] does not implicate any significant interest of the accused." (*United States v. Scheffer, supra*, 523 U.S. at pp. 316–317 (lead opn. of Thomas, J.).) The use of polygraph evidence proposed at defendant's trial was indistinguishable from that proposed in *Scheffer*. Defendant sought the admission of polygraph evidence to bolster her testimony that she was not under the influence of alcohol prior to leaving the restaurant and driving home, and to corroborate evidence suggesting that her subsequently inebriated state (which led to her erratic driving and assault of a custodial officer) could have been caused by someone placing a

drug in the drinks she consumed at the restaurant. Similarly, the airman in *Scheffer* sought to introduce polygraph evidence to bolster his claim of " 'innocent ingestion' " of drugs. (*Id.*, at p. 306.) *Scheffer* held that the exclusion of such evidence did not abridge the defendant's right to present a defense, because the defendant was not prevented from presenting "the relevant details of the charged offense from the perspective of the accused" or from "introducing any factual evidence." (*Id.* at p. 317.) Defendant in the present case testified to her version of the events and presented the testimony of a toxicologist and a police officer in support of her claim of having been drugged. As in *Scheffer*, defendant "was barred merely from introducing expert opinion testimony to bolster [her] own credibility." (*Ibid.*; *Maury, supra*, 30 Cal.4th at p. 414 [concluding the "defense was not significantly impaired by exclusion of the polygraph examination results"].)

## IV

The judgment of the Court of Appeal is reversed. Because no issue has been presented to us concerning defendant's petition for a writ of habeas corpus (see fn. 1, *ante*), we express no opinion on that matter.

Baxter, J., Werdegar, J., Chin, J., Brown, J., and Moreno, J., concurred.

**KENNARD, J.,** Concurring and Dissenting.—I join the majority in holding polygraph evidence inadmissible. I disagree, however, with its conclusion upholding the constitutionality of the statutory provisions concerning battery on a custodial officer.

Two statutory provisions concerning battery on a custodial officer are at issue here: Penal Code section 243.1 makes battery on a custodial officer a felony, whether or not the battery caused injury to the custodial officer.[1] (For convenience, I sometimes refer to the offense defined by section 243.1 as battery on a custodial officer without injury, because injury is not an element of the offense.) Subdivision (c) of section 243 (hereafter section 243(c)), by comparison, makes a battery on a custodial officer that results in injury to the custodial officer an offense punishable either as a felony or as a misdemeanor. (For convenience, I sometimes refer to this offense as battery on a custodial officer with injury.) Although battery on a custodial officer *with* injury is on its face more egregious than battery on a custodial officer *without* injury, it carries a lesser minimum penalty (it may be punished as a misdemeanor) and the same maximum penalty. In this respect, the statutory scheme lacks any

---

[1] Statutory citations are to the Penal Code, unless otherwise noted.

rational basis, in my view, and thereby violates the constitutional guarantee of equal protection of the laws.

## I

" 'The first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more *similarly situated* groups in an unequal manner.' " (*Cooley v. Superior Court* (2002) 29 Cal.4th 228, 253 [127 Cal.Rptr.2d 177, 57 P.3d 654], quoting *In re Eric J.* (1979) 25 Cal.3d 522, 530 [159 Cal.Rptr. 317, 601 P.2d 549]; accord, *People v. Wutzke* (2002) 28 Cal.4th 923, 943 [123 Cal.Rptr.2d 447, 51 P.3d 310].) In this case, persons who commit the *same* illegal act—a battery on a custodial officer causing injury—are in that respect similarly situated, but they are treated differently depending on whether they are charged under section 243.1, which does not require proof of injury, or under section 243(c), which does. The Attorney General's assertion that persons who commit identical acts with the identical mental states but are charged under different statutes are not similarly situated is incorrect when the equal protection issue is the constitutionality of the distinction between the two statutes. (*People v. Nguyen* (1997) 54 Cal.App.4th 705, 714–715 [63 Cal.Rptr.2d 173].)

As the majority observes (maj. opn., *ante*, at p. 838), under the federal and state equal protection clauses the constitutionality of the statutory scheme at issue turns on whether there is a rational basis for the distinction it draws between persons prosecuted under section 243.1 (battery on a custodial officer without injury) and section 243(c) (battery on a custodial officer with injury).[2] (See *Kasler v. Lockyer* (2000) 23 Cal.4th 472, 514 [97 Cal.Rptr.2d 334, 2 P.3d 581] (conc. & dis. opn. of Kennard, J.).) The equal protection clause "does not forbid classifications," but it does forbid "governmental decisionmakers from treating differently persons who are in all relevant respects alike." (*Nordlinger v. Hahn* (1992) 505 U.S. 1, 10 [120 L.Ed.2d 1, 112 S.Ct. 2326]; see *Kasler v. Lockyer, supra*, at p. 515 (conc. & dis. opn. of Kennard, J.).)

## II

The relevant statutory provisions are these:

Section 243.1 declares that battery "committed against the person of a custodial officer" is a felony when the person committing the battery "knows

---

[2] If two groups are not similarly situated, then any "equal protection claim cannot succeed, and does not require further analysis." (*People v. Nguyen, supra,* 54 Cal.App.4th at p. 714.) Thus, by applying a rational basis test, the majority here implicitly acknowledges that the two groups—persons charged under section 243.1 and those charged under section 243(c)—are similarly situated.

or reasonably should know that the victim is a custodial officer engaged in the performance of his or her duties."

Section 243, subdivision (b), makes the same conduct a misdemeanor. It prescribes misdemeanor punishment for a battery "committed against the person of a . . . custodial officer . . . engaged in the performance of his or her duties . . . and the person committing the offense knows or reasonably should know that the victim is a . . . custodial officer . . . ."

Section 243(c) describes more egregious conduct. It requires a battery "committed against a custodial officer . . . engaged in the performance of his or her duties" when "the person committing the offense knows or reasonably should know that the victim is a . . . custodial officer . . . *and an injury is inflicted on that victim*." (Italics added.) Violation of section 243(c) is punishable as either a felony or a misdemeanor, in the discretion of the trial court. (Such crimes are colloquially referred to as "wobblers.")

Finally, section 243, subdivision (d), not directly relevant here, describes an even more serious crime: battery on a custodial officer resulting in *serious* bodily injury. Violation of this provision too can be punished as either a felony or a misdemeanor.

Traditionally, California's sentencing laws have punished more harshly crimes that cause injury than similar crimes that do not. The statutory scheme at issue here, however, goes against this pattern. As the Court of Appeal majority observed, "[t]he current scheme encourages arbitrary, irrational charging." In the case of a battery on a custodial officer that causes injury, there would be no incentive for the prosecutor to charge the defendant under section 243(c) (battery on a custodial officer with injury). By ignoring the injury and charging the defendant under section 243.1 (battery on a custodial officer without injury), the prosecutor is spared the burden of proving the injury and the trial court is precluded from treating the offense as a misdemeanor, an option that would be available to the court if the defendant had been charged with, and convicted of a violation of section 243(c) (battery on a custodial officer with injury).[3]

---

[3] Although the prosecutor has no incentive to charge a defendant with battery on a custodial officer with injury (§ 243(c)), there would still be an incentive to charge a defendant with battery causing *serious* bodily injury (§ 243, subd. (d)) because that offense, although a wobbler, has a higher maximum penalty than of offense defined by section 243.1 (battery on a custodial officer without injury).

Other consequences of the statutory scheme are even more perplexing, as illustrated by the problems involved in instructing a jury in the trial of a defendant charged with a violation section 243(c) (battery on a custodial officer with injury). A trial court must instruct the jury on a lesser included offense when the evidence raises a question whether all of the elements of the charged crime are present, and the evidence would support a conviction of the lesser offense. (*People v. Bradford* (1997) 14 Cal.4th 1005, 1055 [60 Cal.Rptr.2d 225, 929 P.2d 544].) "[A] lesser offense is necessarily included in a greater offense if either the statutory elements of the greater offense, or the facts actually alleged in the accusatory pleading, include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser." (*People v. Birks* (1998) 19 Cal.4th 108, 117 [77 Cal.Rptr.2d 848, 960 P.2d 1073].) Because a defendant cannot commit battery on a custodial officer with injury (§ 243(c)) or battery on a custodial officer causing serious bodily injury (§ 243, sub. (d)) without committing all elements of battery in violation of section 243.1 (battery on a custodial officer without injury), the latter is an offense necessarily included in the crimes of battery on a custodial officer with injury or with serious bodily injury. Consequently, when a defendant is charged with a battery on a custodial officer with injury or serious bodily injury, and there is a question whether the injury occurred, the trial court must instruct on the necessarily included offense of battery in violation of section 243.1 (battery on a custodial officer without injury). If the jury then found the defendant guilty as charged of a battery on a custodial officer causing injury (§ 243(c)), the court would have discretion to impose a misdemeanor sentence. But if the jury, because it entertained a reasonable doubt that the battery had caused an injury to the custodial officer, found the defendant guilty only of the necessarily included offense of battery on a custodial officer (§ 243.1), the trial court would be required to sentence the defendant as a felon.

I can perceive no rational basis for this rather startling statutory scheme. The majority does, however.

The majority first questions whether the offense defined in section 243.1 (battery on a custodial officer without injury) is actually less serious than the offense defined in section 243(c) (battery on a custodial officer with injury). It observes that if we compare two *different* batteries, it is possible that a particular battery without injury could be more heinous than another battery that did cause an injury. (See maj. opn., *ante*, at pp. 839–840.) By the same reasoning, however, a particular petty theft could, depending on the circumstances, be more serious than a particular grand theft, and a particular grand theft could be more serious than a particular robbery, and so forth. Under this reasoning, the legal classification of crimes as inherently "greater" or "lesser" becomes meaningless and a rational ordering of crimes and punishment in the penal law becomes impossible. In deciding which of two crimes is the

greater, the only meaningful comparison is between the elements of each crime, as I discussed at pages 853–855, *ante*, not the particular circumstances of their commission.

The majority also questions defendant's claim that the statutory scheme allows a battery on a custodial officer without injury to be punished more severely than one with injury. The majority points out that the *maximum* punishment under both section 243.1 (battery on a custodial officer without injury) and section 243(c) (battery on a custodial officer with injury) is the same—three years. (See maj. opn., *ante*, at p. 839.) But the majority cites neither authority nor reason for the proposition that when comparing statutes for the purpose of equal protection analysis a court should examine only the maximum punishment and ignore everything else. Here the *minimum* punishment specified under section 243.1 (battery on a custodial officer without injury) is 16 months in state prison (§ 18) while the *minimum* punishment under section 243(c) (battery on a custodial officer with injury) is "a fine of not more than two thousand dollars ($2000) [or] imprisonment in a county jail not exceeding one year." When, as here, the defendant's crime could reasonably be treated as a misdemeanor, it is the minimum punishment that is more important.

The majority holds that section 243.1 (battery on a custodial officer without injury) does not violate the principle of equal protection of the laws because the Legislature could have rationally concluded that reduction of this offense to a misdemeanor is not appropriate whenever the prosecutor deems the offense serious enough for felony prosecution. (Maj. opn., *ante*, at p. 840.) This reasoning misses the point. Equal protection analysis requires comparing two statutes—here section 243.1 (battery on a custodial officer without injury) and section 243(c) (battery on a custodial officer with injury). The majority offers no rational basis for the distinction between them.[4]

I perceive no rational basis for giving trial courts the power to punish as a misdemeanor a charge of battery on a custodial officer with injury, but to

---

[4] The majority mistakenly relies on *United States v. Batchelder* (1979) 442 U.S. 114 [60 L.Ed.2d 755, 99 S.Ct. 2198], a case involving a federal statutory scheme that defined two crimes with essentially the same elements but different penalties. The United States Supreme Court concluded that the federal scheme did not deny equal protection to a defendant convicted of the crime carrying the greater penalty. (*Id.* at pp. 124–125.) The court was not faced with a statutory scheme like the one at issue here, which defines two closely related crimes *and permits lesser punishment for the crime that differs only in requiring one additional aggravating element.* The high court in *Batchelder* thus had no occasion to decide whether a statutory scheme with those irrational features violated the constitutional guarantee of equal protection of the laws. I note, moreover, that the Colorado Supreme Court found the reasoning in *Batchelder* unpersuasive and declined to follow it in construing the equal protection clause of its own state constitution. (*People v. Estrada* (1979) 198 Colo. 188 [601 P.2d 619, 621].)

deny that power as to battery on a custodial officer *without injury* under section 243.1. Could the Legislature rationally believe that some batteries without injury are so serious that the prosecutor must be given unfettered, unreviewable power to ensure that they are prosecuted as felonies, but that this is not the case for batteries causing injury? Conversely, could the Legislature rationally believe that the courts could be trusted to determine when batteries causing injury should be treated as felonies rather than misdemeanors, but could not be trusted to make the same determination as to batteries that did not cause injury? The answer is inescapable: the statutory distinction has no rational basis, thus denying defendant the equal protection of the laws.

The allegations of defendant's petition for habeas corpus filed in conjunction with defendant's appeal, if true,[5] belie the majority's assumption that prosecutors will charge the felony offense of battery on a custodial officer without injury under section 243.1 only when they deem the offense serious enough to warrant felony punishment. Here, after charging defendant with a felony battery under section 243.1, the prosecutor offered to dismiss the felony charge if defendant would plead guilty to a misdemeanor battery, which would be further reduced to an infraction if she successfully completed probation. Defense counsel refused the offer. The prosecutor then offered to dismiss the battery charge if defendant would plead guilty to the misdemeanor of driving under the influence of alcohol or drugs (Veh. Code, § 23152). Defense counsel rejected this offer as well. The case was then prosecuted as a felony. The trial court expressed dismay that the case had not been settled, and, after the jury found defendant guilty as charged, the court placed defendant on probation instead of sending her to prison for the felony conviction.

If true, these facts show that the prosecutor did not consider defendant's conduct so egregious as to require felony punishment. A prosecutor taking that view would not have been so eager to induce defendant to plead guilty to crimes punishable only as misdemeanors. But because defendant was charged

---

[5] The truth of these allegations may be determined at an evidentiary hearing ordered by the Court of Appeal on the habeas corpus petition defendant filed in conjunction with her appeal. At issue there is whether defense counsel failed to consult with defendant before rejecting the prosecution's offers to dismiss the felony charge if defendant would plead guilty to either of two misdemeanors, battery or driving under the influence.

under section 243.1, a mandatory felony, the trial court was prevented from exercising the discretion the Legislature gave it to treat the more serious crime of battery on a custodial officer with injury (§ 243(c)) as a misdemeanor. This kind of injustice is the predictable result of the current irrational statutory scheme.

I would affirm the Court of Appeal.