Filed 1/29/15  In re Precious N. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re PRECIOUS N., a Person Coming Under the Juvenile Court Law. | B255648 (Los Angeles County Super. Ct. No. CK97726) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. ERIC H., Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County. Stephen Marpet, Juvenile Court Referee.  Affirmed.

John L. Dodd, under appointment by the Court of Appeal, for Defendant and Appellant.

Richard D. Weiss, Acting County Counsel, Dawyn Harrison, Assistant County Counsel, Kimberly Roura, Deputy County Counsel, for Plaintiff and Respondent.

_____

Eric H. (Father) contends that the dependency court erred by excluding polygraph evidence and improperly found jurisdiction over his daughter. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

This matter came to the attention of the Department of Children and Family Services (DCFS) in February 2013, after the Los Angeles County Sheriff's Department was called to the home of Peace N. (Mother) to investigate a report of domestic violence.

A social worker interviewed Mother, who stated that a few days before she received a telephone call from Father, who had full custody of their daughter Precious (then age 11) per family court orders. Father requested that Mother pick up Precious because he was "'going crazy'" and "'stressed.'" Mother drove from her home in Covina to Temecula to retrieve Precious. When she arrived, Father was incoherent and said that he could not drive.

Two days later, Father requested a visit with Precious and Mother agreed. According to Mother, when Father arrived at her home, he held her against a wall, grabbed her head, and slammed her head and body against the wall. Mother tried to dial 911, but Father prevented her. Precious tried to intervene by placing herself between her parents, but Father grabbed Precious by the hair and threw her against a wall. Neighbors from Mother's apartment building separated Father from Mother and chased him away.

Mother stated that she and Father had always experienced domestic violence and battles over custody. She said that in 2009, after she filed for child support, Father tried to run her over with his car. She threw a rock at the car, Father called the police, and Mother was arrested and lost custody of Precious.

The social worker interviewed Precious, who stated that she had gone to Temecula with Father and his fiancée for the weekend. Father kept pacing back and forth in the hotel room, saying he was "'stressed out, couldn't think, and couldn't sleep.'" Father asked Precious to call Mother to pick her up. Two days later, in Covina, after Mother opened the door for Father, he cornered her against a wall, grabbed her head, and slammed it against the wall. When Precious attempted to help, Father pulled her by the hair, threw her against a wall, and tried to throw her down the stairs. Precious said she

loved Mother and wished to permanently reside with her. She was afraid of Father because, on other occasions, he had suffocated her with a pillow, slapped her, spit on her, threw her, choked her, and hit her in the stomach.

The social worker also interviewed a friend of Mother's who drove with her to Temecula. She said that it took a long time to find Father because his directions were incoherent. When they arrived at a parking lot to retrieve Precious, Father was pacing and said he was having a breakdown. He referred to Mother as two different people— one, by Mother's first name, as "the 'nice person,'" and a second, by Mother's middle name, as "'the evil person.'"

When Father was interviewed, he said he was granted full custody of Precious because Mother is "'extremely negligent.'" Father said he was "stressed out" and asked Mother to pick up Precious because she and his fiancée did not get along. Father denied pushing Mother or Precious and said he did not corner Mother, but instead was "praying for her." He denied any physical abuse of Precious.

DCFS reported that the family had 21 prior referrals in Los Angeles and Orange Counties. One allegation of neglect by Mother was substantiated, while the remaining allegations, primarily for neglect and abuse by Mother and Father, were unfounded.

DCFS filed a section 300 petition[1] on February 11, 2013. It alleged that Father physically abused Precious and that Mother and Father engaged in violent conduct in the presence of Precious. At the detention hearing, the dependency court ordered Precious detained and released to Mother. Father was granted monitored visits in a therapeutic setting. On February 27, 2013, the dependency court granted a temporary restraining order protecting Mother and Precious from Father, which was subsequently reissued numerous times. In March 2013, DCFS filed an amended section 300 petition, adding an allegation that Father had mental and emotional problems, including a diagnosis of stress and depression.

---

[1]     Unless otherwise noted, all statutory references are to the Welfare and Institutions Code.

A jurisdiction/disposition report noted that Mother was convicted of misdemeanor vandalism in 2009 and given three years' probation. She had completed 26 anger management classes. Father was convicted and imprisoned in 2002 for domestic violence. Father claimed that this conviction was expunged from his record. When interviewed again, Mother said she was a long-term victim of domestic violence by Father. One time, shortly after Precious was born, Father was driving with Mother and Precious in the car. After Father and Mother began arguing, Father made a U-turn while driving very fast, stopped, dragged Mother out of the car, hit her, and then drove away with Precious.

Father was interviewed again and denied the allegations of the section 300 petition. He admitted to being "'stress[ed] in many different ways.'" His fiancée and Precious did not get along, and he felt he had to choose between them. He was exhausted by Precious's behavior and her comments that she wanted to be with Mother. As for the February 2013 incident, Father denied touching Mother or Precious, and stated that Mother "fell on the ground" when he "prayed" for her. Father admitted that he had been diagnosed with adjustment disorder and was prescribed psychotropic medication. He said he had emotional distress from spending his childhood in foster care, where he was abused and lived in a group home. He also stated that Precious was diagnosed with oppositional defiant disorder and it was exhausting dealing with her behavior. An Orange County social worker stated that Precious had been "less than honest" in the past.

The DCFS social worker also interviewed the paternal aunt, Dawn H. She believed that Father was capable of physically abusing Precious and that he had anger issues. Dawn had seen him swing his fist in front of Precious's face, threatening to hit her. She also had seen him aggressively push and pull Precious, and Precious told her that Father choked her and punched her in the stomach. Father admitted to Dawn that he hit Precious. Dawn believed that Father was experiencing severe mental health problems and said that mental health issues ran in the family—the paternal grandfather is schizophrenic and the paternal grandmother has other mental health issues.

4

As of June 2013, Mother had enrolled in individual counseling and a parenting and domestic violence program. Father was not enrolled in services recommended by DCFS. Precious was in counseling and working on addressing the effects of domestic violence and resolving mood and anxiety issues. She had refused any contact with Father.

On June 17, 2013, Mother filed a motion in limine to exclude from the adjudication hearing evidence relating to a polygraph test taken by Father. At a hearing in July 2013, the dependency court ordered Father to submit a brief regarding the admissibility of the polygraph test results, and in August Father filed a motion to admit the results. In October, the court stated it would set a foundational hearing regarding the polygraph evidence, and it invited the parties to submit scientific literature concerning polygraph examinations and their acceptance in the scientific community. The court further stated that pursuant to Evidence Code 352 it would exclude, for foundational purposes, the testimony of the person who performed the polygraph test, Dr. Louis Rovner, as he had a vested career interest in validating the scientific basis of the test, and it would be an undue consumption of time to allow him to testify. Father's counsel thereafter submitted documentation regarding the suitability of polygraph evidence.

Meanwhile, Father's sister, Dawn, reported to DCFS that Father was pressuring her to change the statements she made to the social worker. When Dawn told Father she would not do so, he called her a witch and threatened to "burn her at the stake." He also told her that Precious's dog had committed suicide, but said he did not care if she told the police that he killed the dog. In August 2013, Dawn filed for a restraining order against Father.

Mother successfully completed a parenting program and a domestic violence program. Father, meanwhile, had not enrolled in any DCFS-recommended services as of February 2014. In addition, Father was criminally convicted in connection with the events of February 5, 2013. Father was originally charged with corporal injury to a co-parent and child endangerment. The district attorney later added charges of dissuading a witness and unlawful fighting in a public place. Father accepted a plea agreement and

5

was convicted of the latter two counts. He was sentenced to three years of probation and required to complete 52-week domestic violence and parenting programs.

The jurisdictional and dispositional hearing was held on February 24 through 26, 2014. The court first found that polygraph evidence would not be admitted, stating: "[T]he court in reviewing the evidence is going to deny any *Kelly/Frye* motion at this time. We're now one year into the case and in order for the court even to think about doing a *Kelly/Frye* would have to have expert witnesses appointed and testify and it's an undue consumption of time and I'm going to deny the request."[2] The court denied Father's request to have Dr. Rovner testify, finding that only an independent expert could properly lay a foundation for the introduction of polygraph evidence, and that it was questionable whether such evidence would be admissible anyway.

Precious testified in chambers. She recounted the events of February 5, 2013. She also testified that when she lived with Father he would throw her on the couch and put his hand over her mouth, and she described other physical abuse by Father. Precious stated she had not visited Father since February 2013 because she was scared of "[s]omething going wrong if he gets mad." She acknowledged that when she lived with Father she wanted to live with Mother. She testified, however, that she would not lie to the court just so she could stay with Mother.

Mother testified after Precious. She said that on February 5, 2013, after Father slammed her head into the wall, he "rebuke[d] a demon" "in the name of Jesus." Mother denied telling Precious to lie about Father abusing her.

Father also testified. He said that on February 5, 2013, Precious hit her head on the door of Mother's apartment. Father then prayed for Mother and Mother "fell straight to the floor" and rolled onto her back. Then five or six neighbors began to beat Father

---

[2] See *People v. Kelly* (1976) 17 Cal.3d 24 (*Kelly*) and *Frye v. United States* (D.C.Cir. 1923) 293 F. 1013 (*Frye*). The *Kelly/Frye* test is a judicially created rule relating to admissibility of evidence derived from a new scientific technique. (*People v. Wilkinson* (2004) 33 Cal.4th 821, 843-845.)

and he ran away. Father denied slamming Mother against a wall or throwing Precious. He also denied ever suffocating Precious with a pillow or otherwise physically abusing her. Father said that Precious frequently lied. He acknowledged that he had physically restrained her, but stated it was due to "her flagrant disobedience, her major temper tantrums. She pulls books off the shelf, she slams doors, slams dividers. She throws the pillows off the couch, go after the dog. It was—it was horrible."

In closing, counsel for DCFS, Precious, and Mother all argued that the section 300 petition should be sustained. Father's counsel argued the petition should be dismissed.

The dependency court struck certain allegations from the section 300 petition, but sustained the remainder, as follows: "[A-1, B-1] On 02/05/2013, the child, Precious N[.]'s father, Eric H[.], physically abused the child by attempting to throw the child down the stairs. On prior occasions, the father choked the child, and struck the child's stomach with the father's fists. The father slapped the child, spat at the child, and threw the child onto a couch. Such physical abuse was excessive, and caused the child unreasonable pain and suffering. The child does not wish to reside in the father's home and care, due to the physical abuse of the child by the father. Such physical abuse of the child by the father endangers the child's physical health and safety, creates a detrimental home environment, and places the child at risk of physical harm, damage, danger, and physical abuse. [¶] [A-2, B-2] On 2/05/2013, the child, Precious N[.]'s mother, Peace N[.], and the child's father, Eric H[.], engaged in a violent physical altercation, in which the father grabbed the mother's head, and slammed the mother's head and body, into a wall. The father grabbed the mother's arms. The child intervened on behalf of the mother, during the father's violent assault of the mother, resulting in the father throwing the minor down a few stairs. Such violent conduct by the father against the mother, endangers the child's physical health and safety, and places the child at risk of physical harm, damage and danger."

The dependency court explicitly noted that it found Precious's testimony to be "extremely credible."

As for disposition, the court ordered Precious removed from Father and placed in Mother's custody. DCFS was ordered to provide Mother with family maintenance

services and provide Father with family reunification services.  Father was to have monitored visits at least twice weekly.  He was ordered to complete 52-week domestic violence and parenting courses, to participate in counseling, and to take all prescribed psychotropic medication.  Mother was ordered to complete domestic violence and parenting classes and to participate in counseling.

Father timely appealed the jurisdictional and dispositional orders.  Mother did not appeal.

## DISCUSSION

### I.  The section 300 petition was properly sustained

Father first argues that the dependency court erred by sustaining the section 300 petition because there was no substantial risk of serious harm to Precious at the time of the jurisdictional hearing.  He contends that Mother was capable of providing appropriate care to Precious and there was no ongoing domestic violence between the parents.  Father asserts that custody and related issues should have been addressed in a family law court, not the dependency court.

We review the dependency court's findings for substantial evidence.  "In juvenile cases, as in other areas of the law, the power of an appellate court asked to assess the sufficiency of the evidence begins and ends with a determination as to whether or not there is any substantial evidence, whether or not contradicted, which will support the conclusion of the trier of fact."  (*In re Katrina C.* (1988) 201 Cal.App.3d 540, 547.)  All conflicts are resolved and all legitimate inferences are drawn in favor of the dependency court's order.  (*Ibid.*)  "[W]e review the record in the light most favorable to the court's determinations."  (*In re Heather A.* (1996) 52 Cal.App.4th 183, 193.)  We do not reweigh the dependency court's determinations of fact or credibility.  (*Ibid.*)

A child comes within the jurisdiction of section 300, subdivision (a), if he or she "has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian."  Subdivision (b) applies when, in pertinent part, "The child has suffered, or there is a substantial risk

8

that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child."

Father relies on *In re Daisy H.* (2011) 192 Cal.App.4th 713 in arguing that the possibility of harm to Precious was too remote to impose jurisdiction. That case held: "Physical violence between a child's parents may support the exercise of jurisdiction under section 300, subdivision (b) but only if there is evidence that the violence is ongoing or likely to continue and that it directly harmed the child physically or placed the child at risk of physical harm." (*Id.* at p. 717.) In contrast to this case, the domestic violence at issue in *In re Daisy H.* occurred seven years prior to the filing of the section 300 petition. (*In re Daisy H.*, at p. 717.) Here, the most recent episode of domestic violence occurred only one week before the petition was filed, and the evidence illustrated a history of domestic violence between Mother and Father, including the incident in which Mother threw a rock at Father's car and the episode leading to Father's 2002 conviction for domestic violence. The facts of this case hew more closely to those described in *In re R.C.* (2012) 210 Cal.App.4th 930, 944, where the court found that despite the parents' separation, their history of two separate acts of domestic violence, including violence in front of a child, supported a finding of jurisdiction. Indeed, a long line of cases has held that domestic violence harms children and is a valid basis for finding dependency jurisdiction. "'Both common sense and expert opinion . . . indicate spousal abuse is detrimental to children.'" (*In re Sylvia R.* (1997) 55 Cal.App.4th 559, 562, citing *In re Benjamin D.* (1991) 227 Cal.App.3d 1464, 1470, fn. 5; see also *In re Heather A.*, *supra*, 52 Cal.App.4th at p. 194; *In re Basilio T.* (1992) 4 Cal.App.4th 155, 168.)

Jurisdiction was also proper based on the substantial evidence of Father's physical abuse of Precious. The dependency court found Precious's testimony "extremely credible" and sustained the allegations that Father had attempted to throw her down the stairs, had choked her, and had struck her with his fists.

Father argues that this case is similar to *In re A.G.* (2013) 220 Cal.App.4th 675. In that case, the Court of Appeal found that the dependency court should not have sustained

9

a section 300 petition alleging only that the mother was mentally ill and unable to care for the children, where the father was, and always had been, capable of properly caring for them. (*In re A.G.,* at p. 677.) The court concluded that the petition should have been dismissed and that the matter belonged in family court, where custody and visitation could be determined. (*Id.* at p. 686.)

*In re A.G.* is clearly distinguishable from the instant matter. First, the children in *In re A.G.* had always been cared for by a responsible parent (the father) and had never been harmed. (220 Cal.App.4th at pp. 684-686.) In contrast, Precious was physically abused. Second, the allegations here involved both parents, as they concerned, in part, domestic violence between the parents that continued up to the time these proceedings commenced. Unlike in *In re A.G.*, where the court found that the father had always been capable of properly caring for the children, no such finding was made here. In fact, Mother had previously lost custody to Father, and the dependency court ordered Mother to complete additional domestic violence and parenting classes, as well as counseling. Third, the procedural posture of this case differed from that of *In re A.G.*, where the father asked the juvenile court to terminate the dependency case with a family law order giving Father sole custody, a request in which minor's counsel joined. (*Id.* at p. 682.) No such request was made here. Rather, counsel for Mother, Precious, and DCFS all argued that the section 300 petition should be sustained. The dependency court properly sustained the petition and its finding that Precious was at substantial risk of serious harm was supported by substantial evidence.

## II. Removal from Father was proper

Father next argues that the dependency court's order removing Precious from him was wrongful because Precious was in Mother's care. He bases this argument on section 361, subdivision (c), which provides that, under certain circumstances, a dependent child may "be taken from the physical custody of his or her parents or guardian or guardians with whom the child resides at the time the petition was initiated." According to Father, because Precious was staying with Mother at the time these proceedings were initiated, it was improper to remove her from him.

10

This argument is frivolous. When the section 300 petition was filed, Father had custody of Precious and Precious had only been staying with Mother for a few days. These facts in no way prevented the dependency court from removing Precious from Father's custody, care, and control.

## III. The exclusion of polygraph evidence does not compel reversal

The dependency court excluded Father's proffered polygraph evidence pursuant to Evidence Code section 352. A trial court's ruling on admissibility of evidence is examined for abuse of discretion. (*In re Cole C.* (2009) 174 Cal.App.4th 900, 911.)

Father argues that the dependency court improperly refused to hold a foundational hearing. It has been held that the dependency court is required to hold a foundational hearing to determine the admissibility of relevant polygraph examination results when a party seeks the admission of such evidence at a jurisdictional hearing. (*In re Jordan R.* (2012) 205 Cal.App.4th 111, 122; *In re Kathleen W.* (1987) 190 Cal.App.3d 68, 73.) Father was given the opportunity to submit scientific literature relevant to the issue of reliability of polygraph tests, and, at the jurisdictional hearing, the court stated it reviewed the evidence. It further stated that it would "deny any *Kelly/Frye* motion."

It is unnecessary for us to decide whether the dependency court conducted a sufficient foundational hearing because Father failed to show that polygraph evidence could properly be admitted. As the party seeking to introduce such evidence, Father was required to prove, among other things, that "the reliability of the scientific technique is generally accepted by recognized authorities in the scientific field(s) in which the technique belongs." (*In re Jordan R.*, *supra*, 205 Cal.App.4th 111, 122.) A "*clear majority*" of the relevant scientific community must support the use of the technique. (*Ibid.*)

As of 2012, the relevant scientific community had not generally accepted the use of polygraph examination results for determining credibility in matters such as these. (*In re Jordan R.*, *supra*, 205 Cal.App.4th 111, 128.) The scientific literature presented by Father did not show that acceptance has occurred since then. Further, Father offered no disinterested witnesses who could testify that such techniques are now accepted. (See *id.*

at p. 123 ["In addition to considering published writings in scholarly treatises and journals, the court may receive the testimony of *disinterested and qualified* experts on the issue of the technique's general acceptance in the relevant scientific community."].)

Thus, to the extent the trial court failed to hold a required foundational hearing, such error was harmless. (*Chapman v. California* (1967) 386 U.S. 18, 24.) Moreover, the trial court was justified in relying on the testimony of witnesses instead of polygraph examination results. (*See In re Jordan R.*, *supra*, 205 Cal.App.4th 111, 134 [polygraphic evidence offered to enhance credibility is not binding on court's determination of credibility].)

## DISPOSITION

The jurisdictional and dispositional orders are affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.

BOREN, P.J.

We concur:

ASHMANN-GERST, J.

CHAVEZ, J.