Filed 9/27/16  P. v. Hale CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>      v.<br><br>JARED RAY HALE,<br><br>    Defendant and Appellant. | G051434<br><br>(Super. Ct. No. 12CF1778)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Terri Flynn-Peister, Judge.  Affirmed.

Russell S. Babcock, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr., and Lise S. Jacobson, Deputy Attorneys General, for Plaintiff and Respondent.

\*        \*        \*

A jury convicted Jared Ray Hale of driving under the influence causing bodily injury (Veh. Code, § 23153, subd. (a)) and driving with a blood-alcohol concentration (BAC) of 0.08 percent or more while causing bodily injury (*id*., subd. (b)) when he swerved off the road with a BAC of 0.184 percent and killed his passengers — his three fellow Marines, Christopher Arzola, Jerimiah Callahan, and Jason Chleborad. Based on the victims' fatal injuries, the jury found three great bodily injury (GBI) enhancement allegations to be true. (Pen. Code, § 12022.7, subd. (a); all further undesignated statutory references are to this code.) The trial court sentenced Hale to 11 years in prison.

Hale had prevailed in an earlier, pretrial writ proceeding challenging the prosecutor's initial attempt to charge Hale with three counts of vehicular manslaughter and accompanying GBI enhancements for each deceased victim, which exposed Hale to a potential prison term of 10 years. (*Hale v. Superior Court* (2014) 225 Cal.App.4th 268 (*Hale*).) He contends the prosecutor's refiling of charges as noted above, with a potential prison term of 12 years, constituted vindictive prosecution. He also argues his sentence violates equal protection and the constitutional bar against disproportionate punishment. He further asserts the trial court erred in denying him probation. As we explain, these challenges are without merit, and we therefore affirm the judgment.

I

PROCEDURAL HISTORY

In July 2013, the prosecutor filed an information charging Hale with vehicular manslaughter while intoxicated (§ 191.5, subd. (b). On each of three manslaughter counts, the prosecutor also alleged a GBI enhancement for the other two deceased victims, so that Hale faced both vehicular manslaughter charges and a total of six GBI enhancements for the three victims. Hale filed a motion under section 995 to strike the GBI enhancement allegations, alleging they were necessarily subsumed in the manslaughter counts for each victim. But under then-prevailing authority (*People v.*

2

*Julian* (2011) 198 Cal.App.4th 1524 (*Julian*), later disapproved by *People v. Cook* (2015) 60 Cal.4th 922 (*Cook*)), the trial court was required to deny the motion. The *Julian* court had held a GBI enhancement did not apply where the defendant was charged with manslaughter, but limited that bar to pleading scenarios where the enhancement was attached to the manslaughter count for the same victim. (See *Hale*, *supra*, 225 Cal.App.4th at p. 273.) In other words, under *Julian*, nothing prevented "attaching a GBI enhancement based on one victim's fatal injuries to a manslaughter count pertaining to another victim, *even if the defendant is also charged and convicted of manslaughter for the first victim's death*." (*Hale*, at p. 273, original italics.) Hale sought a writ of mandate to grant his motion striking the GBI enhancements on the manslaughter charges against him, and we granted the petition.

*Cook* had not been decided yet, but we explained that while section 12022.7, subdivision (a), provides for GBI enhancements, the Legislature in subdivision (g) specified such an enhancement "shall not apply to murder or manslaughter . . . ." (*Hale*, *supra*, 225 Cal.App.4th at p. 272.) Subsequently, *Cook* cited *Hale* with approval in a case in which the defendant was charged and convicted of multiple counts of vehicular manslaughter with GBI enhancements, stating, "[W]e conclude that no great bodily injury enhancement can attach to a conviction for murder or manslaughter." (*Cook*, *supra*, 60 Cal.4th at p. 935, 938 ["As the *Hale* court noted, the statutory language is the best indicator of the Legislature's intent"].)

II

SUBSEQUENT FACTUAL AND PROCEDURAL BACKGROUND

After our decision in *Hale*, the prosecutor in June 2014 filed a first amended information charging Hale with two counts as noted above, namely, driving under the influence causing bodily injury and driving with a BAC of 0.08 percent or more while causing bodily injury (Veh. Code, § 23153, subds. (a) & (b)), with three GBI enhancements (§ 12022.7, subd. (a)) on each count, one for each victim. The prosecutor

3

in December 2014 filed a second amended information with slight changes in the underlying factual allegations, but the charges remained the same.

The matter proceeded to trial and, consistent with the standard of review on appeal, we set out the facts in the light most favorable to the jury's verdict and the trial court's sentence of 11 years. (*People v. Snow* (2003) 30 Cal.4th 43, 66.)

Late in the evening of February 13, 2012, Hale drove Arzola, Callahan, and Chleborad to Hennessy's Tavern in Dana Point, arriving between 10:00 and 10:30 p.m. Hale ordered five or six drinks at the bar, including a mixed drink that contained two shots for himself and the remainder of the drinks were for his friends. He and his group continued ordering drinks but no food until around 12:30 a.m. Hale closed his tab at 1:25 a.m., and security cameras showed he and the others departed at 1:50 a.m. Hale drove his 2005 Dodge sedan with Callahan in the front passenger seat and Chleboard and Arzola in the rear passenger seats.

Within 10 minutes, Hale crashed the vehicle off the roadway into a palm tree in a center median. The force of the impact left a u-shaped indentation on the passenger side door, crushed the roof on the passenger side, and shattered the rear window. A deputy sheriff responded to the scene shortly after the collision, and noted a light rain and wet road conditions.

The deputy found Arzola and Callahan were already dead, and called an ambulance for Chleboard, who died at a hospital about an hour later. All three men died from multiple blunt force trauma injuries. Hale was slumped over the steering wheel and appeared to be dead, but gasped for breath when the deputy attempted to find a pulse. Hale smelled of alcohol. Paramedics extracted Hale by cutting the roof off the vehicle and in the course of transporting him to the hospital, drew his blood at the deputy's request.

Forensic testing showed that at 2:40 a.m., Hale's BAC was 0.175 percent. At 3:30 a.m., it was 0.162 percent. A forensic alcohol expert estimated Hale's BAC

4

around the time of the collision was about 0.184 percent. The expert testified that to reach a BAC of 0.162 percent at 3:30 a.m., a man of Hale's weight who began drinking at 10:00 p.m. and finished drinking around 1:30 a.m. would have consumed between 13 and 14 alcoholic drinks. The expert testified that anyone with a BAC of 0.184 percent would be impaired, but individuals with a higher alcohol tolerance might not appear to be impaired.

An accident reconstruction specialist found 100-foot yaw marks and tire striations at the scene. The expert explained at trial that "a yaw mark is a mark left by a tire that is on a vehicle that is turning and at the same time the tire is slipping. It's exceeding its friction value. It's exceeding its grip on the road, so as the tire is slipping and the car is turning, it's leaving a real thin mark on the ground, usually half inch to an inch in width." The expert concluded that the driver of the vehicle made a "slight right-hand turn" as the road curved to the right, "most likely. . . lost traction," and then overcorrected, causing "the car to go back to the left side and get into [the path leaving] the yaw mark, strike the curb, go up and over the center median and strike the tree." Noting the yaw marks and that the roadway was wet, the expert observed that speeding could have been a factor in causing the accident.

Hale testified that he and his fellow Marines returned from a month-long training operation the Thursday before the Monday night collision. He acknowledged he received a safety briefing on his return from the training with the admonition that if "you're going to drink, don't drive. If you're going to drive, don't drink."

The day after the briefing, on Saturday, February 12, Hale drove to a party in Temecula where he drank so much alcohol he became ill and Chleborad had to drive him back to the barracks at Camp Pendleton on Sunday. Continuing to recover the next day, Hale took Sudafed, drank half a bottle of Nyquil, slept until midafternoon, drank some alcohol-free Dayquil, and napped periodically. He initially turned down Arzola and

5

Chleborad when they asked him to go out that night, but then agreed to drive them to Hennessy's Tavern.

Hale testified they arrived around 10:00 p.m. and around 10:30 p.m. he ordered and consumed a double Crown Royal and Coke, but did not drink any alcohol the rest of the night. He admitted he was his group's designated driver for the evening, which another Marine who had been at the bar later confirmed. Hale departed the tavern with his companions just before 2:00 a.m. and, as he drove, his passengers began "playing around" in the car. Hale testified that the last thing he remembered was that during the "horseplay[]," as he leaned on the center console with a lit cigarette in his right hand and his left hand on the steering wheel, he felt a hard thump on his ear, heard someone say, "oh, shit," and saw Callahan spinning around and reaching for the steering wheel. Hale suffered a severe traumatic brain injury, remained in a coma for a month after the accident, and continued to have memory problems at the time of the trial.

A defense expert on the effects of alcohol and driving testified that some individuals with a BAC of 0.17 percent are not impaired for purposes of driving. The expert also testified that Hale processed alcohol slower than average, with an alcohol burn off rate of 0.012 percent, which was less than the typical rate of 0.015 to 0.018 percent. According to the expert, Hale's consumption of alcohol at the party in Temecula could, in combination with his consumption of Nyquil, could account for his BAC after the collision. The expert believed Hale was an episodic binge drinker capable of drinking to high concentration levels. The expert could not determine if Hale's alcohol consumption caused the accident.

The defense also presented the testimony of five witnesses who interacted with Hale at the tavern before the accident, including two other Marines, two bar patrons, and the bar's assistant manager. None observed Hale act in an intoxicated manner. The Marines noted that Hale had warned them previously about the dangers of drinking too much alcohol. The assistant manager served Hale two drinks, but believed the rest were

6

for his friends.  One patron saw Hale purchase alcoholic beverages for others, but Hale appeared to be drinking only water and seemed sober and calm.  One witness said that she left the pub at 2:30 a.m. and hydroplaned on the road on her way home.  Another said that she left the pub at 1:45 a.m. and that her tires lost traction during the drive home.

A deputy sheriff who examined Hale's car testified that it did not have an anti-lock braking system (ABS).  The tread on all four tires was in good condition, with the tread on the front tires was "a little bit more worn down" than the tread on the rear tires, but this would not have caused the accident.

Following the jury's guilty verdict, the trial court sentenced Hale to the midterm of two years for driving under the influence, plus three consecutive three-year terms for the GBI enhancements for each victim.

III

DISCUSSION

A.  *No Vindictive Prosecution*

Hale contends we must reverse his conviction because the prosecutor's pretrial amendment of the charges following his successful writ petition constitutes vindictive prosecution.  As a preliminary matter, Hale has forfeited the challenge by failing to raise it below.  (*People v. Ledesma* (2006) 39 Cal.4th 641, 730 (*Ledesma*) ["Defendant did not preserve the issue because he did not make any motion in the trial court based upon a theory of vindictive prosecution"]; see *People v. Kennedy* (2005) 36 Cal.4th 595, 612 [forfeiture "prevents a party from engaging in gamesmanship by choosing not to object, awaiting the outcome, and then claiming error"].)  In any event, we are not persuaded on the merits of Hale's claim.

Hale relies on cases holding a presumption of vindictiveness arises when the defendant is subjected to a harsher sentence on retrial after obtaining post-conviction relief.  "The concept of a vindictive prosecution applies not only to vindictiveness by a bench officer (*North Carolina v. Pearce* (1969) 395 U.S. 711 (*Pearce*)), but also to

7

conduct of a prosecutor (*Blackledge v. Perry* (1974) 417 U.S. 21 (*Perry*))." (*People v. Puentes* (2010) 190 Cal.App.4th 1480, 1484.) "The central notion underlying the rule of those cases is that a person who has suffered a conviction should be free to exercise his right to appeal, or seek a trial de novo, without apprehension that the state will retaliate by 'upping the ante' with more serious charges or a potentially greater sentence." (*People v. Bracey* (1994) 21 Cal.App.4th 1532, 1543 (*Bracey*).) Vindictive prosecution violates due process. (*Perry*, at pp. 27-28; *Bracey*, at pp. 1542-1543.)

The presumption of vindictiveness applies to new charges after jeopardy has attached (*United States v. Goodwin* (1982) 457 U.S. 368, 374-375 (*Goodwin*); see, e.g., *Ledesma*, *supra*, 39 Cal.4th at p. 731 [after appeal]; *In re Bower* (1985) 38 Cal.3d 865, 873 [after mistrial]), but not in the pretrial setting. (*Goodwin*, at pp. 381-382; *Bracey*, *supra*, 21 Cal.App.4th at p. 1544 ["California courts have followed the Supreme Court in refusing to apply a presumption of vindictiveness for prosecutorial action before commencement of trial"].) As *Goodwin* explained, "A prosecutor should remain free before trial to exercise the broad discretion entrusted to him to determine the extent of the societal interest in prosecution. An initial decision should not freeze future conduct." (*Goodwin*, at p. 382.)

To establish a claim of vindictive prosecution under state or federal law when "vindictiveness is not presumed, the defense must present evidence showing that the "'prosecutor's charging decision was motivated by a desire to punish [the defendant] for doing something the law plainly allows him to do.""" (*People v. Michaels* (2002) 28 Cal.4th 486, 515.) The mere timing of a new charge "[i]s not sufficient to raise a reasonable likelihood of vindictiveness so as to shift the burden to the prosecution to explain the reasons for its exercise of prosecutorial discretion." (*People v. Farrow* (1982) 133 Cal.App.3d 147, 153 (*Farrow*).) Rather, the defendant must show "actual vindictive[ness]." (*Ibid.*) "A claim of vindictive prosecution, standing alone, is not a substitute for evidence. [Citation.] '[S]o long as the prosecutor has probable cause to

8

believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file . . . generally rests entirely in his discretion.' [Citation.]" (*People v. Peyton* (2014) 229 Cal.App.4th 1063, 1075.)

Here, Hale relies on the fact that the prosecutor's initial information erroneously alleged GBI enhancements for the two other deceased victims on each count of vehicular manslaughter for each deceased victim. As we explained in granting Hale's writ petition, the language in section 12022.7's authorization of a great bodily enhancement "precludes the prosecutor's duplicative charging theory for the victims' great bodily injuries necessarily subsumed in their deaths." (*Hale*, *supra*, 225 Cal.App.4th at p. 277; see § 12022.7, subd. (g) ["This section shall not apply to murder or manslaughter . . . [, nor] if infliction of great bodily injury is an element of the offense"].) As we also observed, however, existing law authorized the charges (*Hale*, at p. 271, fn. 1), primarily based on a concern for punishment commensurate with the gravity of the defendant's offense. (See *id.* at p. 274, quoting *Julian* ["'To hold [the surviving victim's] injuries will support an enhancement but, because she died, Amanda's injuries will not, would permit a defendant . . . to benefit to some extent from the fact that one of his multiple victims died rather than survived. We of course must reject such a grotesque interpretation of the statute'"].)

In *Hale*, we observed that striking the GBI enhancements resulted in potential term of five years and four months under the existing information, i.e., a four-year upper term on one voluntary manslaughter count, and two consecutive eight-month terms as one-third the midterm on the others. (*Hale*, *supra*, 225 Cal.App.4th at p. 275, fn. 3.) In contrast, the prosecutor in filing the information foresaw a potential 10-year term (*ibid.*), consisting of four years as an upper term on one vehicular manslaughter count, and two three-year GBI enhancements for the other victims, with a stay under section 654 for the other manslaughter counts and their respective GBI enhancements.

When the prosecutor filed the amended information after remittitur in the writ proceeding, Hale faced a maximum potential sentence of 12 years, consisting of an upper term of three years for driving under the influence or driving with a BAC of 0.08 percent or more (§ 23153, subds. (a) & (b)), and three years for each of the three GBI enhancements (§ 12022.7, subd. (a)) based on the victims' fatal injuries. As evidence of prosecutorial vindictiveness, Hale seizes on the fact that the potential 12-year term more than doubled the potential five year-four month term on the original information, after our mandate in the writ proceeding directed the trial court to grant his motion to strike the GBI enhancements. But the mere refiling of charges in the pretrial period does not demonstrate vindictiveness (*Farrow*, *supra*, 133 Cal.App.3d at p. 153), and the differential in potential terms did not shift the burden to the prosecutor to rebut vindictiveness for several reasons.

First, as noted, Hale did not raise the issue below, so the prosecutor did not have the opportunity to consider Hale's claims and offer rebuttal if he wanted to explain he did not harbor a vindictive state of mind. Nor did Hale give the trial court the opportunity to rule on the issue; it is therefore forfeited. (See *People v. Partida* (2005) 37 Cal.4th 428, 435 [trial court does not err "in failing to conduct an analysis it was not asked to conduct"].)

Second, the differential between the potential 12-year sentence and the five year-four month sentence resulted from a legal error. That error is not evidence of vindictiveness because the prosecutor's charging theory was expressly authorized under existing case law at the time. (*Hale*, *supra*, 225 Cal.App.4th at p. 271, fn. 1) Third and related, based on the prosecutor's legal error in the initial information, the prosecutor's state of mind is more accurately considered in light of his original expectation that a 10-year sentence was possible under the initial information, rather than a sentence of five years and four months. The 12-year potential maximum under the refiled charges — and 11 year sentence that Hale actually received — are not so divergent from the original

10

10-year maximum that they suggest actual vindictiveness. The 11-year sentence is very close to the original maximum Hale faced; accordingly, his showing of vindictiveness is slight at best. (See *Ledesma*, *supra*, 39 Cal.4th at p. 731 [no showing of vindictive prosecution where "the prosecution sought the same sentence upon retrial that it did at the initial trial"].)

Finally, even assuming arguendo that the new charges shifted the burden to the prosecutor to rebut vindictiveness, Hale's claim fails for a manifest reason rooted in "some objective change in circumstances." (*In re Bower*, *supra*, 38 Cal.3d at p. 879.) Simply put, our mandate directing the trial court to grant the motion to strike the GBI enhancements reduced the potential punishment for Hale's offenses almost in half, and the prosecutor reasonably could conclude without raising an inference of vindictiveness that a maximum sentence of five years and four months was insufficient punishment. Determining "the societal interest in prosecution" is vested in the prosecutor's sound discretion, and when his initial charging theory proved to be flawed in securing that interest, the prosecutor was "free before trial to exercise the broad discretion entrusted to him" to pursue different charges. (*Goodwin*, *supra*, 457 U.S. at p. 382.) Hale's claim of prosecutorial vindictiveness is without merit.

B.    *Sentencing Challenges*

1.    No Constitutional Violation

Hale contends his 11-year sentence violates the equal protection guarantee in the federal and state Constitutions (U.S. Const., 14th Amend.; Cal. Const., art. I, § 7) and the prohibition in each against disproportionate punishment in their cruel and/or unusual punishment clauses (U.S. Const., 8th Amend.; Cal. Const., art. I, § 17). Because Hale did not object to his sentence below on these grounds, he forfeits them on appeal. (*People v. Pecci* (1999) 72 Cal.App.4th 1500, 1502-1503 [equal protection]; *People v. Speight* (2014) 227 Cal.App.4th 1229, 1248 [cruel or unusual punishment]; see *United*

11

*States v. Olano* (1993) 507 U.S. 725, 731 ["'No procedural principle is more familiar to this Court than that a constitutional right,' or a right of any other sort, 'may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it'"].)  In any event, Hale's challenges fail on the merits.

Hale bases his equal protection claim on our observation in his earlier writ petition that his minimal exposure to a sentence of five years and four months on the then-pending charges of vehicular manslaughter for killing three victims was "glaring and unjust" compared to defendants facing a sentence up to 12 years for driving under the influence and inflicting great bodily injury on three victims who do not die. (*Hale*, *supra*, 225 Cal.App.4th at pp. 276-277 & fn. 3.)  There, the disparity Hale identified furnished no basis for an equal protection claim because it inured to his benefit.  (*Ibid.*)

Here, where Hale now has been charged and convicted for driving under the influence and causing great bodily injury to three victims, rather than vehicular homicide, settled law precludes his equal protection claim.  (*United States v. Batchelder* (1979) 442 U.S. 114, 123-125 (*Batchelder*); *People v. Wilkinson* (2004) 33 Cal.4th 821, 838-839 (*Wllkinson*).)  His disproportionality claim fails because there is nothing that "shocks the conscience" in the length of his sentence considering the gravity of his offenses.  (*In re Lynch* (1972) 8 Cal.3d 410, 424 (*Lynch*) [punishment must be so severe as to "offend[] fundamental notions of human dignity"].)

Hale's equal protection claim fails under settled law because he had no right to any particular charging decision by the prosecutor.  The discretion to charge a particular offense rather than another rests in the prosecutor.  (*Batchelder*, *supra*, 442 U.S. at p. 123; *Wilkinson*, *supra*, 33 Cal.4th at p. 839.)  As the high court explained in *Batchelder*: "[T]here is no appreciable difference between the discretion a prosecutor exercises when deciding whether to charge under one of two statutes with different elements and the discretion he exercises when choosing one of two statutes with identical

12

elements. In the former situation, once he determines that the proof will support conviction under either statute, his decision is indistinguishable from the one he faces in the latter context. The prosecutor may be influenced by the penalties available upon conviction, but this fact, standing alone, does not give rise to a violation of the Equal Protection or Due Process Clause. [Citations.] Just as a defendant has no constitutional right to elect which of two applicable federal statutes shall be the basis of his indictment and prosecution, neither is he entitled to choose the penalty scheme under which he will be sentenced. [Citations.]" (*Batchelder*, at p. 125.)

Similarly, our Supreme Court has observed, "[N]umerous factors properly may enter into a prosecutor's decision to charge under one statute and not another, such as a defendant's background and the severity of the crime, and so long as there is no showing that a defendant 'has been singled out deliberately for prosecution on the basis of some invidious criterion,' that is, '"one that is arbitrary and thus unjustified because it bears no rational relationship to legitimate law enforcement interests[,]"' the defendant cannot make out an equal protection violation." (*Wilkinson*, *supra*, 33 Cal.4th at pp. 838-839.) Consequently, Hale's equal protection claim fails under *Batchelder* and *Wilkinson*.

Hale's disproportionate punishment claim also fails. Punishment that is grossly disproportionate to the offender's culpability violates constitutional norms prohibiting "cruel and unusual" (U.S. Const., 8th Amend.) and "cruel or unusual" (Cal. Const., art. I, § 17) punishment. (See, e.g., *Ewing v. California* (2003) 538 U.S. 11, 20 [8th Amend. "contains a 'narrow proportionality principle'"]; *People v. Dillon* (1983) 34 Cal.3d 441, 478 ["punishment may violate the constitutional prohibition not only if it is inflicted by a cruel or unusual method, but also if it is grossly disproportionate to the offense for which it is imposed"].)

Gross disproportionality is a high bar under federal law, surmounted "only in the 'exceedingly rare' and 'extreme' case. [Citations.]" (*Lockyer v. Andrade* (2003) 538 U.S. 63, 73 [two consecutive 25-years-to-life sentences for third strike petty

13

theft of videotapes not invalid]; *Harmelin v. Michigan* (1991) 501 U.S. 957, 1001 [life without parole sentence for possessing 672 grams of cocaine not cruel and unusual] ); see *Solem v. Helm* (1983) 463 U.S. 277, 296-297 [life imprisonment without the possibility of parole for $100 bad check violates 8th Amend.].)  Similarly, state constitutional "[f]indings of disproportionality have occurred with exquisite rarity in the case law." (*People v. Weddle* (1991) 1 Cal.App.4th 1190, 1196.)  The defendant must overcome a "considerable burden" to show the sentence is disproportionate. (*People v. Wingo* (1975) 14 Cal.3d 169, 174.)

The test is whether the punishment is "so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*Lynch*, *supra*, 8 Cal.3d at p. 424, fn. omitted.)  The defendant must demonstrate the punishment is disproportionate in light of (1) the offense and defendant's background, (2) more serious offenses, or (3) similar offenses in other jurisdictions.  (*Id.* at pp. 429-437.)  Similarly, the United States Supreme Court has observed that "a court's proportionality analysis under the Eighth Amendment should be guided by objective criteria, including (i) the gravity of the offense and the harshness of the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for commission of the same crime in other jurisdictions." (*Solem*, *supra*, 463 U.S. at p. 292.)

Hale only relies on the second factor concerning assertedly more lenient, "anomalous" punishment for more serious offenses in the same jurisdiction.  As *Solem* noted, however, "no one factor will be dispositive in a given case." (*Solem*, *supra*, 463 U.S. at p. 290, fn. 17.)  We interpret Hale's failure to address the other factors as a concession his sentence withstands scrutiny on those grounds. (*People v. Retanan* (2007) 154 Cal.App.4th 1219, 1230; *People v. Crooks* (1997) 55 Cal.App.4th 797, 808 [defendant's burden to establish disproportionality].)

14

In any event, the mere potential of a lesser sentence for vehicular manslaughter does not warrant reversal. As discussed, the charging decision rests in the prosecutor's discretion and, more fundamentally, nothing in Hale's sentence of 11 years "shocks the conscience" as unconstitutionally harsh. Hale's reliance on *Lynch* is misplaced. There, the court reversed a life term imposed for a second indecent exposure conviction. (*Lynch*, *supra*, 8 Cal.3d at p. 424.) The harsh sentence in *Lynch* does not compare to Hale's sentence, based on the gravity of Hale's offense. There is no merit in Hale's disproportionate punishment challenge.

2. The Trial Court Did Not Err in Denying Probation

Hale contends the trial court erred by declining to place him on probation so he could participate in a treatment program for military service-related posttraumatic stress disorder (PTSD) under section 1170.9, subdivision (a). He also argues the court erred by relying on sentencing circumstances that were not supported by the record. We review a trial court's decision to grant or deny probation under the deferential abuse of discretion standard. (*People v. Ferguson* (2011) 194 Cal.App.4th 1070, 1091.) "To establish abuse, the defendant must show that, under all the circumstances, the denial of probation was arbitrary, capricious or exceeded the bounds of reason." (*People v. Bradley* (2012) 208 Cal.App.4th 64, 89.) We conclude the trial court did not abuse its discretion.

Hale asserts the trial court failed to expressly consider the PTSD symptoms he suffered from his military service as a factor in favor of probation under section 1170.9. Section 1170.9, subdivision (a), provides in pertinent part, "In the case of any person convicted of a criminal offense who could otherwise be sentenced to county jail or state prison and who alleges that he or she committed the offense as a result of sexual trauma, traumatic brain injury, post-traumatic stress disorder, substance abuse, or mental health problems stemming from service in the United States military, the court

15

shall, prior to sentencing, make a determination as to whether the defendant was, or currently is, a member of the United States military and whether the defendant may be suffering from sexual trauma, traumatic brain injury, post-traumatic stress disorder, substance abuse, or mental health problems as a result of his or her service."

Section 1170.9, subdivision (b), provides, "(1) If the court concludes that a defendant convicted of a criminal offense is a person described in subdivision (a), and if the defendant is otherwise eligible for probation, the court shall consider the circumstances described in subdivision (a) *as a factor in favor of granting probation.* [¶] (2) If the court places the defendant on probation, the court may order the defendant into a local, state, federal, or private nonprofit treatment program for a period not to exceed that period which the defendant would have served in state prison or county jail, provided the defendant agrees to participate in the program and the court determines that an appropriate treatment program exists." (Italics added.)

The record reveals the trial court expressly considered Hale's PTSD diagnosis and the terms of section 1170.9 favoring probation. Hale filed a motion for a grant of probation under section 1170.9, which the trial court considered at the outset of the sentencing hearing, stating its "intention . . . to proceed with the hearing, pursuant to 1170.9 . . . as is required by the Penal Code." The court noted it had read and considered the parties' filings and the probation department's presentencing report. In particular, the report specified Hale had served in the Marine Corps for almost five years, that his service included a combat tour in Afghanistan, and that he had been "diagnosed with a 30% [PTSD] rating by the Department of Veteran's Affairs." The report also stated Hale was "statutorily eligible for probation consideration and has been identified as a combat veteran who could be eligible for Veteran's Court should the Court find him suitable."

The court also stated at the hearing that it had read section 1170.9 and the case law interpreting it, and that the law required consideration of six factors. (See *Ferguson*, *supra*, 194 Cal.App.4th at p. 1091 [identifying factors].) The trial court found

16

Hale satisfied the first three factors: he was a United States Marine who had served in combat, he suffered from PTSD and a traumatic brain injury (he sustained the brain injury in the accident, not combat), and he was eligible for probation. The court said it would address the fourth factor — whether it would place Hale on probation — separately. The court then found the fifth and sixth criteria were satisfied as there appeared to be a proper facility for treatment and Hale agreed to participate.

At the trial court's invitation, defense counsel discussed Hale's PTSD condition extensively, citing letters submitted to the court from a psychiatrist who served with Hale in the deadly Sanguin Valley region in Afghanistan, from an expert in alcohol-related PTSD and the military, and from Hale's treating neuropsychologist, among others. Counsel emphasized the Commandant of the Marine Corps had taken the unusual step of ordering all Marines in Hale's combat unit to be screened by a psychiatrist, and counsel explained the link between PTSD and the offense, including that military members with PTSD often self-medicate with alcohol. Counsel noted Hale repeatedly expressed remorse, took responsibility at trial for the collision, and stressed Hale was not seeking amnesty or leniency. Instead, he proposed that the court suspend the state prison sentence and order Hale to serve two years in county jail followed by two years in a residential treatment program, which the trial court declined.

Contrary to Hale's claim, section 1170.9 does not require the trial court to expressly *state* that it has considered a defendant's service-related PTSD as a factor favoring probation. Hale suggests that because the Legislature added subdivision (b) to section 1170.9 on January 1, 2015, less than a full month before the sentencing hearing on January 30, 2015, the court may have been unaware of the express language in the new subdivision stating that "the court shall consider the circumstances described in subdivision (a) as a factor in favor of granting probation."

We must presume, however, that the court is aware of and applies applicable law (Evid. Code, § 664), and there is no contrary evidence here. Rather, the

17

foregoing demonstrates the trial court gave ample consideration to Hale's PTSD diagnosis and probation under section 1170.9, and the natural effect of such evidence is not as aggravating evidence to preclude probation, but as mitigating evidence in favor probation, if appropriate. The court stated it considered the information Hale submitted, including counsel's argument for treatment on probation instead of a prison sentence, to address "his PTSD as a result of his military service." Consequently, the trial court did not err in failing to consider PTSD as a factor favoring probation.

Alternatively, Hale argues the evidence does not support the trial court's conclusion several factors outweighed his PTSD condition, precluding probation. He argues the court erred in relying on "[t]he nature, seriousness, and circumstances of the crime" as an aggravating factor (Cal. Rules of Court, rule 4.414(a)(1)) because "[t]here was nothing aggravated about the current offense other than it resulted in three fatalities." But the trial court reasonably could consider three fatalities made the seriousness of Hale's offense far worse than others, particularly since he acted as the group's designated driver, yet drove with a BAC of 0.184 percent. As the trial court noted, Vehicle Code section 23578 requires consideration of a BAC of 0.15 percent or greater as a special factor weighing against probation.

On appeal, Hale suggests the "primary causes" of the accident were "the heavy raining and the lack of an ABS system" on his vehicle, but the evidence at trial showed a light rain and that Hale drove too fast for the conditions, carrying them in a 100-foot yaw over the median and into a tree with enough force to crush the passenger side and roof of the vehicle. The trial court reasonably found the nature, seriousness, and circumstances of the offense weighed against probation. (See *People v. Leung* (1992) 5 Cal.App.4th 482, 506 [trial court's sentencing choices "need only be established by a preponderance of the evidence"].)

Hale asserts the trial court erred in relying on his infliction of physical or emotional injury (Cal. Rules of Court, rule 4.414(a)(4)) as a reason to deny probation.

18

He relies on the fact that causing bodily injury is already an element of Vehicle Code section 23153, subdivisions (a) and (b), and great bodily injury is accounted for in his three three-year GBI sentencing enhancements. To the contrary, "where the facts surrounding the charged offense exceed the minimum necessary to establish the elements of the crime, the trial court can use such evidence to aggravate the sentence." (*People v. Castorena* (1996) 51 Cal.App.4th 558, 562.) Here, the fatal injuries Hale caused were in excess of the "harm or hurt to the body" required under Vehicle Code section 23153, and in excess of the "significant or substantial physical injury" (§ 12022.7, subd. (f)) necessary for the GBI enhancement. Moreover, "[t]here is no prohibition on using the same fact to deny probation and enhance punishment." (*People v. Bowen* (1992) 11 Cal.App.4th 102, 106.) The trial court imposed the midterm rather than the upper term for Hale's driving offense, but properly considered the fatalities he caused as a reason to deny probation.

Hale contends the trial court erred in finding he "'took advantage of a position of trust or confidence to commit the crime.'" (Capitalization omitted, quoting Cal. Rules of Court, rule 414(a)(9).) Hale acknowledges he agreed to be the designated driver, but asserts "there was no evidence as the trial court found that he tried to conceal his intoxication or sneak drinks on the side." Hale's companions put their trust in him as the designated driver, but he betrayed them by driving with a BAC of 0.184 percent, whether that arose from his earlier binge drinking and consumption of Nyquil or from consuming more alcohol at the bar than just the double shot he admitted. The trial court reasonably could conclude Hale abused his position of trust as the designated driver.

Hale asserts the trial court had no basis for uncertainty about whether he would comply with the terms of probation. (Cal. Rules of Court, rule 4.414(b)(4).) He points to his "military service history" and argues the court "should not have speculated that he might not be able to follow probation," but the court reasonably could consider

19

Hale failed to abide by his superiors' admonition just days earlier: do not drink and drive.

Finally, Hale argues the trial court erred in finding that by "maintain[ing] his story that he did not drink that night, . . . this causes the court to question the sincerity of his accepting responsibility. The court does not find his story plausible or believable." Hale points to portions of his testimony and other statements showing his "complete acceptance of responsibility." He also notes he admitted consuming a double mixed drink at the bar and argues he presented "plausible evidence that his intoxicated state could have been caused by residual alcohol in his system from previous binge drinking" including, presumably, his consumption of Nyquil. But it was the trial court's province to weigh the evidence in deciding whether to grant probation. Notably, the trial court reasonably could doubt Hale's claim of residual intoxication where a criminalist testified a person his size would have to consume 20 or more ounces of Nyquil containing 25 percent alcohol to reach a 0.184 percent BAC at 2:00 a.m. Hale had testified he consumed half a bottle of Nyquil the day of the accident, and the prosecutor presented evidence that the largest bottle sold is only 14 ounces. The trial court could infer from this evidence that based on Hale's BAC level, he may have consumed more alcohol than he admitted. In any event, any one of the factors the trial court identified suffices to support the court's decision to deny probation. There was no error.

20

### III

### DISPOSITION

The judgment is affirmed.


                                        ARONSON, ACTING P. J.

WE CONCUR:


FYBEL, J.


IKOLA, J.